UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE OF
MICHIGAN,

                Plaintiff,

-and-

UNITED STATES OF AMERICA,

                Plaintiff-Intervenor,

                                    Case Number 05-10296-BC
v.                                  Honorable Thomas L. Ludington

JENNIFER GRANHOLM, *Governor of the
State of Michigan*, MIKE COX, *Attorney General
of the State of Michigan*, JAY B. RISING,
*Treasurer of the State of Michigan*,

                Defendants,

-and-

CITY OF MT. PLEASANT and COUNTY OF
ISABELLA,

                Defendant-Intervenors.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS TO AMEND ANSWERS, GRANTING THE UNITED STATES'S MOTION IN LIMINE AND FOR PARTIAL SUMMARY JUDGMENT, GRANTING SAGINAW CHIPPEWA'S MOTION TO STRIKE, DENYING UNITED STATES'S MOTION TO STRIKE EXHIBITS, DENYING AS MOOT MICHIGAN'S MOTION TO FILE SUR-REPLY, AND BIFURCATING CASE ON COURT'S OWN MOTION

The parties have brought eight motions before the Court but they may be summarized as

requesting two general categories of relief.  First, Defendants Governor Jennifer Granholm, Attorney

General Mike Cox, and Treasurer Jay B. Rising ("Michigan Defendants" or "State of Michigan"),

Defendant-Intervenor County of Isabella ("Defendant County"), and Defendant-Intervenor City of Mt. Pleasant ("Defendant City," collectively "Defendants") filed motions to amend their answers for the purpose of asserting certain additional equitable defenses not included in their initial answers. Second, Plaintiff Saginaw Chippewa Indian Tribe of Michigan ("Saginaw Chippewa") and Plaintiff-Intervenor United States of America ("United States") filed motions to exclude the advancement of, and evidentiary support for, certain time-passage based equitable defenses. For the reasons stated below, the Court will **GRANT** Defendants' motions to amend their answers and **GRANT** the United States's motion for partial summary judgment precluding Defendants' witnesses relating to their equitable defenses and the Saginaw Chippewa's motion to strike defenses or limit discovery.

## I

## A

On November 21, 2005, the Saginaw Chippewa initiated the instant suit to enforce certain rights it believes were established by a series of treaties between the "Chippewa of Saginaw"[1] and the United States. The primary focus of the Saginaw Chippewa's action is their interpretation of treaties executed in 1855 and 1864. *See* Treaty with the Chippewa of Saginaw, Etc., U.S.-Chippewa, Aug. 2, 1855, 11 Stat. 633 ("1855 Treaty"); *see also* Treaty with the Chippewa of Saginaw, Swan Creek, and Black River, U.S.-Chippewa, Oct. 18, 1864, 14 Stat. 657 ("1864 Treaty"). In the 1855 Treaty, the United States granted to the Saginaw Chippewa, inter alia, "unsold public lands [within] . . . [s]ix adjoining townships of land[2] in the county of Isabella." 11 Stat. 633, art. 1. In consideration for the land in the six townships located in the County of Isabella, the

---

[1] The Saginaw Chippewa contend that it is the successor of interest to the "Chippewa of Saginaw."

[2] According to the Saginaw Chippewa's complaint, the townships are Wise, Nottawa, Isabella, Denver, Deerfield, and the northern one-half of the townships of Union and Chippewa. Dkt. # 17 at 10.

Saginaw Chippewa "cede[d] all the lands within the State of Michigan heretofore owned by them as reservations, and whether held for them in trust by the United States or otherwise." 11 Stat. 633 at art. 3. The 1855 Treaty also contained the following "dissolution" provision: "The tribal organization of said Indians, except so far as may be necessary for the purpose of carrying into effect the provisions of this agreement, is hereby dissolved." 11 Stat. 633, art. 6.

Likewise, the 1864 Treaty reserved all "unsold lands . . . within the six townships of Isabella County," reserved in the 1855 Treaty, for the Saginaw Chippewa's "exclusive use, ownership, and occupancy." 14 Stat. 657, art. 2. In exchange, the Saginaw Chippewa relinquished all ownership rights in land situated on the Saginaw Bay of Lake Huron. 14 Stat. 657, art. 1. Members of the Saginaw Chippewa deemed "competent" [3] received title to real property in fee simple. 14 Stat. 657, art. 3. Although not entirely clear from the parties' pleadings, it appears that the treaties address a contiguous geographical area located in the County of Isabella. Prior to the existence of the treaties, certain portions of the county were "owned" by non-members of the Saginaw Chippewa. The treaties granted title to the Saginaw Chippewa of some parcels of land within the County of Isabella. The treaties recognized the Saginaw Chippewa's autonomy to govern those parcels as Indian country. Michigan Defendants, authorities of Defendant County, and authorities of Defendant City also allege that they exercise jurisdiction in certain respects over the parcels of land granted to the Saginaw Chippewa.

The Saginaw Chippewa's complaint seeks "prospective declaratory and injunctive relief,

---

[3] The 1864 Treaty defined "competent" members to be those that were "intelligent, and [had] sufficient education, and [were] qualified by business habits to prudently manage their affairs." 14 Stat. 657, art. 3. Tribal members deemed "not so competent" were defined as "those who [were] uneducated, or unqualified in other respects to prudently manage their affairs, or who are of idle, wandering, or dissolute habits, and all orphans." *Id.* "Not so competent" members received title with "a provision that the land shall never be sold or alienated to any person or persons whomsoever, without the consent of the Secretary of the Interior for the time being." *Id.*

requiring State officials to recognize the historic Isabella Reservation as Indian country under federal law, and prohibiting such officials from enforcing Michigan state law against the Tribe and its members within the historic Isabella Reservation in a manner inconsistent with the reservation's status as Indian country and therefore in violation of the Constitution and laws of the United States." *Am. Compl.* at ¶ 1. More specifically, the Saginaw Chippewa request that the Court issue "[a] declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202 and other applicable law, declaring that the six township historic Isabella Reservation, as established by Executive Order and Treaty in 1855 and affirmed by Treaty in 1864, exists today as an Indian reservation and is Indian country pursuant to federal law." *Id.* at ¶ 44. In addition, the Saginaw Chippewa seek a permanent injunction prohibiting Defendants from asserting criminal or civil regulatory jurisdiction over the Saginaw Chippewa or its members within the historic Isabella Reservation in a manner inconsistent with federal law. *Id.* at ¶ 45.

Michigan Defendants' answer to the amended complaint asserts various affirmative defenses, including their assertion that the predecessors of the Saginaw Chippewa ceded all aboriginal rights to the State of Michigan through a series of treaties, including the 1855 Treaty and the 1864 Treaty, dissolving the recognized Indian tribe known as the Saginaw Chippewa. Dkt. # 18 at 7. Additionally, Michigan Defendants assert that the United States Congress "recognized that the Saginaw Chippewa Indian Tribe had been dissolved and jurisdiction over the care of individual Saginaw Chippewas had been committed to the State of Michigan in 1934." *Id.* Michigan Defendants also assert that the Saginaw Chippewa unduly delayed bringing this action by more than 100 years, and the State of Michigan reasonably developed the understanding that it, and its subordinate levels of government, enjoy exclusive civil and criminal jurisdiction over the real

property granted in the 1855 Treaty and 1864 Treaty. *Id.* Consequently, Defendants contend the Saginaw Chippewa's request for relief is barred by the doctrine of laches.

On March 2, 2006, the Saginaw Chippewa and Michigan Defendants' entered into a "Joint Stipulation Narrowing Issues Related to Jurisdictional Defenses" ("Joint Stipulation"). Dkt. # 15. The Joint Stipulation acknowledged that the Saginaw Chippewa's complaint "raised a genuine case and controversy regarding the central issue in this litigation: Whether and to what extent the lands located within the exterior boundaries of the townships identified in Article 1 of the [1855 Treaty] and in Article 2 of the [1864Treaty], constitute 'Indian country' pursuant to federal law." *Id.* at 2. The parties agreed that the laches affirmative defense "require[s] extensive development of the historical record relating to the merits of the case" and would be appropriately resolved after the completion of discovery but before trial. *Id.* at 3. The parties also decided that, among other things, the Saginaw Chippewa only sought remedies related to jurisdiction over tribal members and did "not seek remedies related to the Tribe's jurisdiction over non Indians within the alleged historic Isabella reservation as part of this litigation." *Id.* at 2.

In the event that the Saginaw Chippewa is successful in this proceeding, it is noteworthy that the United States would continue to exercise criminal jurisdiction over the reservation in certain respects. Two federal statutes, the Major Crimes Act, codified at 18 U.S.C. § 1153, and the Other Crimes Act, codified at 18 U.S.C. § 1152, confer exclusive jurisdiction to the United States to prosecute certain crimes[4] committed in Indian country against non-Indians.

---

[4] The Major Crimes Act confers exclusive jurisdiction to the United States over any one of the following crimes committed by an Indian in Indian country: "murder, manslaughter, kidnapping, maiming, . . . incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury . . . an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery . . . ." 18 U.S.C. § 1153(a). The Other Crimes act provides that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the

B

The immediate case does not represent the first instance that the Saginaw Chippewa and the United States have challenged the scope of the State of Michigan's governmental authority over Saginaw Chippewa members residing on the historic Isabella reservation. In 1991, the United States, in its trust capacity, and the Saginaw Chippewa, challenged the State of Michigan's authority to collect *ad valorem* property taxes on real property located entirely on a reservation owned in fee simple absolute by members of the Saginaw Chippewa or the tribe itself. *See United States on Behalf of Saginaw Chippewa Tribe v. Michigan*, 882 F.Supp. 659 (E.D. Mich. 1995). The Honorable Robert H. Cleland found that "the treaty of 1855 provided for specific grants of land to various classes of Indians [and] . . . [t]he treaty of 1864 then provided a further step toward assimilation by providing for an eventual end to the relationship between Indian allottee as beneficiary and the United States as trustee (with the land as the *res*)." *Id.* at 662.

The court recognized the "complex procedural history" of the case and twice held oral arguments to address two tiers of issues. *Id.* at 661. First, the court heard arguments "with regard to the issue of reservation status (i.e., whether a reservation was created and whether, if created, it was diminished) and tribal status (i.e., whether the tribe was dissolved pursuant to the 1864 Treaty) . . . ." *Id.* at 661-62. Second, the parties addressed "the propriety of levying *ad valorem* property taxes." *Id.* at 662. In the court's opinion, it expressly declined to address the first issue, reasoning that it was inconsequential to the issue of whether Michigan could impose *ad valorem* property taxes. *Id.* at 663. The court held that real property within the historic Isabella reservation, held by

---

Indian country." 18 U.S.C. § 1152

the Saginaw Chippewa and its members, was subject to *ad valorem* taxation because the tribe and its members held title in fee simple absolute and the real property was freely alienable. *Id.* at 677.

The Sixth Circuit Court of Appeals reversed the district court's ruling, holding that the State of Michigan could not tax land held in fee simple by members of the Saginaw Chippewa without express congressional authorization. *United States on Behalf of Saginaw Chippewa Tribe v. Michigan*, 106 F.3d 130, 131-32 (6th Cir. 1997). The Sixth Circuit remanded the case to the district court to make a determination about the status of the reservation and the tribe.

Michigan appealed to the United States Supreme Court, which granted certiorari, vacated the judgment, and remanded the case to the Sixth Circuit for further consideration in light of its decision in *Cass County v. Leechlake Band Chippewa Indians*, 524 U.S. 103 (1998). *Michigan v. United States*, 524 U.S. 923 (1998). In *Leechlake*, the Supreme Court held that state governments may impose *ad valorem* taxes "on reservation land that was made alienable by Congress and sold to non-Indians by the Federal Government, but was later repurchased by a tribe," because "Congress has made unmistakably clear its intent to allow such taxation." *Leechlake*, 524 U.S. at 106 (citation and quotations omitted). After the Supreme Court remanded the matter to the Sixth Circuit, the parties consensually dismissed the case.

C

In the spring of 2006, counsel for the Saginaw Chippewa informed the Court that the United States was contemplating intervening as a party in the immediate case. The United States sought additional time to review relevant documents before making a decision. In light of the United States's possible intervention, this Court issued a series of orders suspending the scheduling order and extending time for the United States to file a motion to intervene. *See* dkt. # 23-28. Ultimately,

the United States moved to intervene as a plaintiff seeking to advance "its own distinct sovereign interests." Dkt. # 29 at 2. The motion was not opposed by any party. On November 1, 2006, the Court granted the motion.

The United States intervened as a plaintiff on its own behalf and as trustee for the Saginaw Chippewa. The United States seeks a declaratory determination that all lands within the boundaries of the Isabella Reservation, as established by the 1855 Treaty and the 1864 Treaty, are "Indian Country" under 18 U.S.C. § 1151(a). Dkt. # 35 at 1-2. The United States's complaint "does not seek monetary damages, compensation for trespass, ejectment, injunctive relief, or any other remedy related to the dispossession of Indian lands." Dkt. # 67 at 7. Also, the United States agreed to abide by the Joint Stipulation.

In September of 2007, Defendant County and Defendant City each moved to intervene by right, or alternatively, with the Court's permission. While Sixth Circuit jurisprudence favors granting intervention as a matter of right, *see, e.g.*, *Mich. State AFL-CIO v. Miller,* 103 F.3d 1240, 1245-46 (6th Cir. 1997), the Court denied Defendant County's and Defendant City's motions to intervene by right. Neither Defendant County nor Defendant City possess any authority independent of or greater than that of the State of Michigan. *See Bivens v. Grand Rapids*, 505 N.W.2d 239 (Mich. 1993). As municipal entities, each derives its rights from the Constitution of Michigan and the Michigan legislature. *See City of Taylor v. Detroit Edison Co.*, 715 N.W.2d 28, 31 (Mich. 2006); *see also* MICH. CONST. art. 7 §§ 1, 17, 21. Consequently, Michigan Defendants adequately represent Defendant City's and Defendant County's interests. The similarity of interests, in conjunction with the fact that Defendant County and Defendant City moved to intervene nearly two years after the Saginaw Chippewas filed its complaint, persuaded the Court that neither retained the

right to intervene.

The Court did grant Defendant County's and Defendant City's motions to permissively intervene, subject to the Court imposed conditions confining both Defendant County and Defendant City to the opinions of Michigan's treaty interpretation experts and the terms of the Joint Stipulation. In doing so, the Court recognized that an outcome in favor of the Saginaw Chippewa may affect Defendant County's and Defendant City's governmental responsibilities. *See* Dkt. # 50 at 10. While Michigan Defendants could competently advance arguments on Defendants' behalf, the participation of Defendant County and Defendant City is advantageous in the event that a remedy needs to be fashioned. Thus, permissive intervention ensured Defendant County's and Defendant City's active participation in the litigation without unduly delaying the case's progress.

## II

The parties appear to agree, for the most part, that the substantive issues framed in the initial pleadings are governed by the 1855 Treaty and 1864 Treaty, though the parties' papers do not extensively outline the factual information related to their respective interpretation of the treaties. Michigan Defendants, however, submitted a copy of their expert witness's report. *See* dkt. # 83-3. The United States has registered an objection to expert reports being tendered to the Court at this stage of the case; its objections has some merit. *See* dkt. # 97. However, the contents of the report assist the understanding of the treaty interpretation issues framed by the parties contrasted to the issues framed by the "equitable" defenses Defendants seek to advance against the United States. Consequently, the Court will deny the United States's motion to strike.

The State of Michigan's expert, Anthony G. Gulig, Ph.D., serves as a professor of history at the University of Wisconsin-Whitewater. His doctoral emphasis was focused on "Canadian and

American Indian-white relations and Indian policy." Dkt. # 83-3 at 89. Dr. Gulig's report addresses the federal government's and the Saginaw Chippewa's[5] purposes in entering into, and interpretation of, the treaties at the time of execution. *Id.* at 4. It also discusses the "federal treaty commissioner's intent in including the allotment provisions" of the treaties and whether the treaties created a continuing reservation. *Id.*

Dr. Gulig concludes that the signatories on behalf of the Saginaw Chippewas were "skilled negotiators" that actively participated in the treaty process. *Id.* at 6. Initially resistant to "the transition from a hunting, fishing, and gathering economy to a more sedentary, agrarian-based existence," he asserts that the Saginaw Chippewa recognized that securing legally-recognized, defined boundaries to their territory was advantageous. *Id.* Thus, the 1855 Treaty provided the Saginaw Chippewa "access to selected lands in severalty in Isabella County, Michigan." *Id.* The 1864 Treaty, on the other hand, resulted from the Saginaw Chippewa approaching the federal government to secure lands in severalty for their children – an issue unaddressed by the 1855 Treaty. *Id.* Dr. Gulig offers the following conclusions from his interpretation of the treaties in the context of their historical adoption:

> At no time did the Saginaw, Swan Creek and Black River Chippewas express a desire, or an understanding, that lands withdrawn from sale according to the terms of the 1855 treaty were to be held in common by or for them, nor did they understand that the 1864 treaty established a reservation to be held in common by or for them or their descendants.
>
> The single most pressing interest apparent among those individual Indians owed land allotments by the 1855 and 1864 treaties was to have the patents issued to them in fee
> simple at the earliest opportunity.

---

[5] The report discusses the Saginaw Chippewa, the Swan Creek Chippewa, and the Black River Chippewa. It is unclear whether each is an individually recognized tribe whose members were signatories to the instant treaties or all comprise the tribal entity referred to as the Saginaw Chippewa.

*Id.* at 5-6.

Importantly, Dr. Gulig focuses on the events preceding and immediately following the 1855 Treaty and the 1864 Treaty. He concludes that the treaties effectively dissolved the reservation, splintering the real property into individually held parcels of land held in fee simple. *Id.* at 85.

The United States's motion in limine and for partial summary judgment targets testimony of Defendants' witnesses offered in support of time-based equitable defenses. Dkt. # 67 at 6. The United States contends that it is entitled to this relief because the testimony will not be relevant to the treaty interpretation issues under Federal Rule of Evidence 401. The United States also contends that it is entitled to partial summary judgment under Federal Rule of Civil Procedure 56 because the time-based equitable defenses may not be dispositively asserted against the United States as a matter of law.

While the Saginaw Chippewa's motion to strike defenses also asserts that laches and estoppel are ineffective in the instant case, it also emphasizes that it seeks to limit testimony offered regarding "the speculative future effects" of a judgment in favor of Plaintiffs. Dkt. # 73 at 14. The Saginaw Chippewa emphasizes that "future effects" testimony is irrelevant to any time-based equitable defense because those defenses rely on past events. Likewise, such testimony is also irrelevant to the interpretation of the treaties. The Saginaw Chippewa provide the following examples of potential witnesses to be offered for this purpose:

> Sheriff Leo Mioduszewski is offered by [Defendant County] to testify regarding the effect on law enforcement in [sic] declaring six townships in Isabella County "Indian Country." Julie Warner is offered by [Michigan Defendants] to discuss the effect on children's protective services in [sic] declaring six townships in Isabella County "Indian Country." And [Defendant City] offers Nancy Ridley to testify regarding [Defendant City's] collection of fines, fees, and taxes within the city limits including the enforcement thereof, and the potential impact of a ruling declaring the six

townships Indian Country.

*Id.*  The Saginaw Chippewa emphasizes that Defendants have named twenty-four potential witnesses to provide similar "effect" testimony.  *Id.*

Defendants believe that such testimony is relevant to the issues developed in the Saginaw Chippewa's complaint.   For instance, Defendant County offers witnesses for the purpose of demonstrating the "distinctly non-Indian character of the area and its inhabitants," the history of local government jurisdiction, and the potential "disruptiveness" of limiting Defendants' jurisdiction.   Dkt. # 82 at 5.   Similarly, Defendant City seeks to admit State of Michigan misdemeanor and felony criminal records from the 1950's through the 1980's documenting criminal activity within the Isabella reservation for the purpose of demonstrating the extended period of time during which it has exercised jurisdiction over members of the Saginaw Chippewa.  *See* dkt. # 85 at 19-20.  Michigan Defendants also seek to offer additional evidence through four expert reports that demonstrate that the State of Michigan has exercised jurisdiction over the inhabitants of the land at issue and that the Saginaw Chippewa presently owns a relatively small amount of real property in the historic Isabella reservation.   Moreover, Michigan Defendants contend that few Saginaw Chippewa members reside in the historical Isabella reservation.   Dkt. # 83 at 5-6.   Additionally, Michigan Defendants seek to present evidence of forward looking "disruption including testimony regarding potential law enforcement problems."   *Id.* at 20-21.

Currently, Defendants' answers each assert the affirmative defense of laches.   Michigan Defendants' answer also offers the affirmative defense of impossibility, and Defendant City's answer raises the affirmative defense of estoppel.   Defendants' motions to amend seek to include

the affirmative defenses of acquiescence and impossibility,[6] not included from the current answer.

Laches is the "negligent and unintentional failure to protect one's rights." *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (citation and quotation omitted). It is incumbent upon the party advancing laches to demonstrate prejudice resulting from the opposing party's lack of diligence. *Id.* Laches is not simply "a mere lapse of time," rather, the inactive party's delay must have misled another party into believing that the claim was abandoned, that the inactive party acquiesced, or resulted in some other prejudice. *Id.*

Similarly, the doctrine of acquiescence is applicable when a party does not intentionally protect its rights. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (citation and quotation omitted). "Laches is a negligent and unintentional failure to protect one's rights while acquiescence is intentional. Acquiescence requires a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his [] rights against the defendant." *Id.*; *see also Chirco*, 474 F.3d at 231.

Equitable estoppel lies further down the spectrum, as its application requires an affirmative representation of a material fact by the party to be estopped. *Thomas v. Miller*, 489 F.3d 293, 302 (6th Cir. 2007) (citation and quotations omitted). While the doctrines of laches and acquiescence rely on a party's omission, equitable estoppel applies when a party's affirmative conduct is inconsistent with a later adopted position. *Horton v. Ford Motor Co.*, 427 F.3d 382, 388 (6th Cir. 2005). To state a claim for equitable estoppel, a party must satisfy the following elements:

First, the party to be estopped must have used conduct or language amounting to a

---

[6] Defendant City also requests that it be allowed to amend its answer to include the affirmative defense of impracticability. With respect to Indian law claims, impractibility is an alternate term for the impossibility doctrine. *See*, *e.g.*, *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 219 (2005).

representation of material fact. Second, that party must have been aware of the true facts. Third, that party must have had an intention that the representation be acted on, or have conducted himself in such a way toward the party asserting estoppel that the latter had a right to believe that the former's conduct was so intended. Fourth, the party asserting estoppel must have been unaware of the true facts. Finally, the party asserting estoppel must have detrimentally and justifiably relied on the representation.

*Thomas*, 489 F.3d at 302 (citation and quotation omitted).

Traditionally, the doctrines of impossibility and impracticability are equitable defenses to the enforceability of a contract. *See, e.g., Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 149-50 (6th Cir. 1983). Federal courts have applied these terms for the alternative proposition that relief sought by Indian tribes is either impracticable or impossible due to events subsequent to the execution of treaties with the United States government. *See, e.g., City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 219-20 (2005); *see also Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, Cal. v. City of Los Angeles*, 2007 WL 521403, * 10 (E.D. Cal. Feb. 15, 2007). Ultimately, each of the equitable defenses share the common characteristic, as they would be relevant to this case, of relying on events that either post-date the adoption of treaties or that might occur in the future, and events that are extraneous to the interpretation of the treaties and later acts of Congress.

### III

The initial question to be addressed is whether Defendants may amend their answers to include certain equitable defenses. Pursuant to Federal Rule of Civil Procedure 15(a)(2), leave to amend pleadings is to be given freely "when justice so requires." A party seeking to amend an answer "must act with due diligence if it intends to take advantage of the Rule's liberality." *United States v. Midwest Suspension and Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995). A court may deny

leave to amend when a party unnecessarily delayed in seeking amendment, thereby, causing prejudice to the other party or unduly delaying the litigation. *Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994) (citation omitted). "In determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction." *Id.*

Here, it is appropriate to grant Defendants leave to amend their answers and to address their merits in conjunction with Plaintiffs' motions. The amendment will not prejudice Plaintiffs. As Defendants emphasize, the amendment will not lead to supplemental witnesses. Defendants' witness lists currently identify all of the witnesses that they have offered in support of the equitable defenses. Moreover, Defendants have not unduly delayed in bringing this amendment in light of Plaintiffs' pace in preparing the case. At the request of the United States, the Court delayed proceedings to provide it an opportunity to determine whether it sought to intervene. The Saginaw Chippewa, in the meanwhile, did not object to the delay caused by the United States's decision-making process. Defendants' motions to amend their answers will be granted.

## IV

As Defendants' answers may now be amended to plead the full range of equitable defenses, attention must then be focused on the legal criteria and standard of review attendant to Plaintiffs' motions seeking to limit, strike, and dispose of those defenses as a matter of law. That is, the United States describes its request as one for relief under Federal Rule of Civil Procedure 56 and as a motion in limine. Saginaw Chippewa, on the other hand, seek to strike the affirmative defenses

pursuant to Federal Rule of Civil Procedure 12(f).

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not

"rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. "[T]he party opposing the summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (citations and internal quotations omitted).

With respect to a motion in limine, "[a]lthough the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). A district court retains broad discretion in determining the admissibility of evidence. *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006). Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." It is axiomatic that irrelevant evidence is inadmissible. Fed. R. Evid. 402. "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *United States v. Franco*, 484 F.3d 347, 351 (6th Cir. 2007) (citations omitted).

Finally, a court, acting sua sponte or on a party's motion, may strike any "insufficient defense" from a pleading. Fed. R. Civ. P. 12(f). "A motion to strike under Rule 12(f) is proper where it will eliminate spurious issues before trial and streamline the litigation." *Ameriwood Indus.*

*Int'l Corp. v. Arthur Anderson & Co.*, 961 F.Supp. 1078, 1083 (W.D. Mich. 1997) (citation omitted). A party must demonstrate, however, that an affirmative defense "cannot succeed under any circumstances." *Id.* (citation omitted).

V

The federal government's authority to enter into treaties with Indian tribes is derived from several provisions of the United States Constitution. The commerce clause authorizes Congress "to regulate commerce . . . with the Indian tribes," U.S. CONST. art. I, § 8, which "recognizes tribes as distinct political entities." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 390 (Neil Jessup Newton ed., 2005). The President of the United States retains the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . ." U.S. CONST. art. II, § 2 ("The Treaty Clause").

The congressional power to approve treaties is amplified by two constitutional provisions of general application. First, the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18, magnifies congressional authority to regulate Indian tribes, similar to other areas within Congress's authority. COHEN'S HANDBOOK, *supra* at 391 (citing *McCulloch v. Maryland*, 17 U.S. 316 (1819)). Second, the Supremacy Clause, U.S. CONST. art. VI, cl. 2, mandates that laws and treaties of the United States concerning Indian tribes supercede conflicting state laws and constitutional provisions, which ensures consistent governance of Indian tribes. *See generally Cherokee Nation v. Georgia*, 30 U.S. 1, 26 (1831). Inherent in Congress's relationship with Indian tribes is the ability to unilaterally abrogate treaties, either directly or indirectly, through subsequent legislation. The Supreme Court recognized Congress's power to do so in *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566 (1903), which provides as follows:

When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the power to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians.

*Id.* (emphasis omitted).  Thus, the Constitution confers on the federal government the primary authority to govern relations with Indian tribes through the exercise of the Commerce Clause and its authority to enter into and diminish treaties.

The policy of conferring a status equivalent to foreign nations upon Indian tribes embedded in the United States Constitution was partially modeled after Great Britain's earlier assertion of its exclusive authority to address the Indian tribes during colonial times.  Prior to the American Revolutionary War in 1775, the colonies each sought to administer control over Indian tribes independent from the central government of the time, Great Britain.  WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW 12 (4th ed. 1998).  In order to avoid conflict between colonies and the Indian tribes that potentially could have ignited prolonged Indian wars, the British Crown accorded Indian tribes with the status of foreign sovereign nations and negotiated with tribal representatives in a formal capacity.  *Id.*

After independence and ratification of the Constitution, Congress  maintained a similar policy seeking to limit conflicts between the states and Native-American tribes.  Congress's initial legislation defining substantive rights and duties in the area of Indian affairs was the "Act to regulate trade and intercourse with the Indian tribes," Act of July 22, 1790, 1 Stat. 137 (1790), commonly referred to as the Non-Intercourse Act.[7]  *See Sherrill*, 544 U.S. at 197*; see also* COHEN'S HANDBOOK, *supra* at 37.  Along with regulating trade between the federal government and the tribes,

---

[7]  Congress updated the Non-Intercourse Act through the enactment of subsequent legislation.  *See, e.g.,* Act of March 30, 1802, 2 Stat. 139 (1802); Act of June 30, 1834, 4 Stat. 729 (1834).

a "fundamental element" of the Nonintercourse Act was to prohibit the transfer of tribal lands to another party, whether a state government or a private party, unless consummated in proceedings overseen by federal officials. *Id.* By requiring the explicit involvement of the federal government in any land transaction between state governments and Indian tribes, the Nonintercourse Act curtailed states' authority to unilaterally engage the Indian tribes and expanded the federal government's role as the single conduit with Indian tribes.

The development of governments' relationships – federal and state – with Indian tribes continued when the United States Supreme Court decided *Worcester v. Georgia*, 31 U.S. 515 (1832), where Chief Justice John Marshall addressed the unique status of Indian tribes. In the preceding Supreme Court term, the Marshall Court determined that Indian tribes were not foreign sovereign states; rather, "domestic dependent nations . . . their relation to the United States resembl[ing] that of a ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. 1, 16 (1831).

In *Worcester*, a missionary challenged his criminal conviction for violating a Georgia statute requiring non-Indians to acquire a license before residing in Indian territory. 31 U.S. at 536. The Court considered whether the criminal statute was a "rightful exercise of [state] power" or an usurpation of "the treaties and laws of the United States [that] contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union." *Id.* at 557-58.

The Court acknowledged that Indian tribes, even if not properly characterized as independent foreign sovereigns, were granted a degree of sovereignty through the Nonintercourse Act pursuant to Congress's constitutional authority. The Court reasoned as follows:

> From the commencement of our government, congress has passed acts to regulate
> trade and intercourse with the Indians; which treat them as nations, respect their

rights, and manifest a firm purpose to afford that protection which treaties stipulate. All these acts, and especially that of 1802, which is still in force, manifestly consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.

*Id.* at 556-57. The Court went on to address the sovereign integrity of the Cherokee nation and the unique constitutional relationship of the Cherokee nation to the government of the United States.

The Court explained as follows:

In opposition to this original right, possessed by the undisputed occupants of every country; to this recognition of that right, which is evidenced by our history, in every change through which we have passed; is placed the charters granted by the monarch of a distant and distinct region, parceling out a territory in possession of others whom he could not remove and did not attempt to remove, and the cession made of his claims by the treaty of peace.

The actual state of things at the time, and all history since, explain these charters; and the king of Great Britain, at the treaty of peace, could cede only what belonged to his crown. These newly asserted titles can derive no aid from the articles so often repeated in Indian treaties; extending to them, first, the protection of Great Britain, and afterwards that of the United States. These articles are associated with others, recognizing their title to self government. The very fact of repeated treaties with them recognizes it; and the settled doctrine of the law of nations is, that a weaker power does not surrender its independence – its right to self government, by associating with a stronger, and taking its protection. A weak state, in order to provide for its safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state. Examples of this kind are not wanting in Europe. 'Tributary and feudatory states,' says Vattel, 'do not thereby cease to be sovereign and independent states, so long as self government and sovereign and independent authority are left in the administration of the state.' At the present day, more than one state may be considered as holding its right of self government under the guarantee and protection of one or more allies.

The Cherokee nation, then, is a distinct community occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States.

*Id*. at 560-61.  Turning to the defendant's conviction for violating Georgia criminal law, the Chief

Justice found it to conflict with these recognized rights, reasoning as follows:

> They interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, are committed exclusively to the government of the union.
>
> They are in direct hostility with treaties, repeated in a succession of years, which mark out the boundary that separates the Cherokee country from Georgia; guaranty to them all the land within their boundary; solemnly pledge the faith of the United States to restrain their citizens from trespassing on it; and recognize the pre-existing power of the nation to govern itself.

*Id*. at 561-62.  Thus, the Marshall Court defined Indian tribes' status in relation to the federal

government and provided a clear limit on the states' authority to affect tribal sovereignty.

In addition to the federal government's authority to engage Indian tribes, inter se, it has also

been held to act as a fiduciary to protect the interests of tribes.  The federal government's fiduciary

duty has been recognized to exist as legal duty, while in some instances being described as a mere

"moral or political obligation."  CANBY, *supra* at 35.  The distinction appears grounded on

Congress's role in approving treaties.  Underlying Justice Marshall's opinions in *Cherokee Nation

v. Georgia*, 30 U.S. 1, 17 (1831) and *Worcester v. Georgia*, 31 U.S. 515 (1832), was recognition of

Indian tribes' reliance on the federal government to guard their interests.  As Supreme Court

jurisprudence has evolved, so has the definition of the trust relationship.

More than fifty years after Justice Marshall's characterization of Indian tribes as "domestic

dependent nations," the Supreme Court again described Indian tribes' status as "dependent" and

"wards of the nation."  *United States v. Kagama*, 118 U.S. 375, 384 (1886) (emphasis omitted)

(holding federal criminal statutes concerning acts on Indian reservations constitutional).  The federal

government's exclusive right to assert its authority to enforce federal law on all Indian tribes has

"never been denied," which is consistent with the counterbalancing conclusion in *Worcester* that state law is ineffective over tribal lands. *Id.* Consequently, the federal government also retains the duty of protection of Indian tribes. *Id.*

Two decades later, the Supreme Court characterized Congress's "plenary authority" over Indian tribes to be "political" in nature and outside of the judicial branch's "control." *Lone Wolf*, 187 U.S. at 565. "Congress possess[es] a paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests, and that such authority might be implied, even though opposed to the strict letter of a treaty with the Indians." *Id.* Embedded in the scope of congressional dominion is the "good faith" authority to unilaterally abrogate treaty provisions in the interest of the country and the Indians. *Id.* Thus, with respect to congressional authority, the federal government's trust relationship provides a sword rather than a shield for Indian tribes.

In contrast, the Supreme Court has been less willing to permit the executive branch to exercise its trust relationship for the benefit of the federal government. *See Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113 (1919). In *Cramer v. United States*, 261 U.S. 219, 229 (1923), the Supreme Court rejected the federal government's attempt to transfer tribal lands to third parties in the absence of legislation granting title to the Indian tribe. The Court reasoned that "to hold that by so doing [the Indian tribe] acquired no possessory rights to which the government would accord protection would be contrary to the whole spirit of the traditional American policy toward these dependent wards of the nation." *Id.*

Indeed, the Supreme Court has gone so far as to explicitly recognize the federal government's role as "necessarily a fiduciary" for Indian tribes. *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (fiduciary relationship arose from statutes that directed the Secretary of the Interior

manage lands on behalf of an Indian tribe).  Ultimately, when statutory language directs the executive branch to actively protect Indian tribes' interests, a fiduciary relationship arises.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475-76 (2003).  COHEN'S HANDBOOK summarized the distinction between acts of the two branches as follows:

> Rather than serving as a mechanism to bar [actions by the federal government to dispose of tribal property or alter the relationship] during this period, the trust relationship served to bolster the exercise of a power that would be constitutionally suspect based solely on the enumerated powers of Congress, and served to immunize the United States from suit challenging these actions . . . When the issue was not one of congressional power, however, but of executive management of tribal resources, the courts invoked principles of private trust law to hold the United States to the most exacting fiduciary standards.

COHEN'S HANDBOOK, *supra* at 420.  As a result, Supreme Court jurisprudence recognizes the federal government's trust responsibility to be separate from, and independent of, its right to act as a sovereign in its own right.

In 1871, Congress sought to limit the executive branch's ability to enter into new treaties by extinguishing the prospective ability of the government to recognize Indian tribes as independent nations. 25 U.S.C. § 71.  Important to this case is the fact that the legislation expressly provided that existing treaties remained intact.  *Id.*  Although the subject of debate concerning the constitutionality of the law, it expressed Congress's intention to no longer ratify Indian treaties.  CANBY, *supra* at 19. Thereafter, the federal government utilized statutes or executive orders (until 1919 when Congress disallowed the practice) when entering into agreements with Indian tribes.  *Id.*

IV

In 1953, Congress again altered both the federal government's relationship with Indian tribes and, most importantly, that of the states when it passed 67 Stat. 588, as amended, 18 U.S.C. § 1162; 28 U.S.C. § 1360 ("Public Law 280"), which explicitly extended state governments' jurisdiction

over most tribal lands situated in six states – Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin. Moreover, it permitted all other states to assume criminal and civil jurisdiction over tribal lands through state legislation. 67 Stat. 590.[8] Approximately nine states assumed varying degrees of jurisdiction over tribal lands. CANBY, *supra* at 250.

With respect to civil jurisdiction, Public Law 280 vested jurisdiction in state governments "over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country . . . and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country." 28 U.S.C. § 1360(a). Additionally, 18 U.S.C. § 1162(a) transferred "jurisdiction over offenses committed by or against Indians in the areas of Indian country" and recognizing that state criminal laws would have the "same force and effect" within Indian country. 18 U.S.C. § 1162(a).

Although Public Law 280 shifted a great deal of responsibility of governance to the states, it by no means eliminated the federal government's role in regulating Indian country. For instance, Public Law 280 included the explicit limitation of authority as follows:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

18 U.S.C. § 1162(b); 28 U.S.C. § 1360(b).

---

[8] Section 7 of Public Law 280 provides "[t]he consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal and civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." 67 Stat. 590.

Moreover, the United States Supreme Court narrowly interpreted the impact of Public Law 280 on a state government's ability to assert civil jurisdiction in *Bryan v. Itasca County, Minnesota*, 426 U.S. 373 (1976), recognizing that the "primary concern of Congress [in enacting Public Law 280] . . . was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Id.* at 379. The Court also noted the "virtual absence of expression of congressional policy or intent" concerning a grant of civil jurisdiction to state governments. *Id.* at 381. To the extent that Public Law 280 transferred civil jurisdiction, the Court reasoned that Congress intended "to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes." *Id.* at 383. Ultimately, the Court concluded that the congressional intent of Public Law 280 was not to transfer civil regulatory authority or the taxing power to state governments. *Id.* at 393.

In 1968, Congress altered Public Law 280 by requiring the consent of affected Indian tribes before a state government could exercise criminal and civil jurisdiction over tribal lands. 25 U.S.C. §§ 1321-22. Similarly, this grant of authority contained a provision expressly excluding states' authority to alienate, encumber, or tax any Indian controlled real or personal property. 25 U.S.C. § 1321(b); 25 U.S.C. § 1322(b).

Finally, Indian tribes, the third arm of this triumvirate, retain certain jurisdictional authority within "Indian Country" stemming from its relationship with the federal government. Congress defines Indian Country as follows:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or

subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Under the statutory definition, an area's designation as Indian Country is not contingent on whether the area was settled or is owned by Indians. *See Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 357-58 (1962). Towns, for example, incorporated by non-Indians under state law located on an Indian reservation are still considered Indian Country. *Id.* Congress, however, can abandon a reservation's status as Indian Country or diminish the boundaries of tribal jurisdiction by permitting widespread settlement by non-Indians. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977).

## VII

Tribal boundary line questions intended to be resolved by treaties or later acts of Congress have developed a reasonably well-established jurisprudence. *Id.* at 586-87. Because Congress can abandon a reservation's status or diminish the boundaries of tribal jurisdiction by authorizing settlement by non-Indians, the analysis is focused on the treaties themselves and any later act by Congress that might alter the treaties. *See id.*

In *Rosebud Sioux*, the United States Supreme Court addressed an Indian tribe's action that certain congressional actions had not diminished the reservation or altered the boundaries established in a treaty between the tribe and the federal government. *Id.* at 585-86. The petitioner sought a declaration that Congress's post-treaty legislation permitting the non-Indian settlement of unallocated land did not diminish the reservation. *Id.* at 585. The Court analyzed three post-treaty acts of Congress that opened unallocated lands within the reservation to settlement. *See id.* at 602.

The Court rejected a blanket rule that because Congress had "opened [a reservation] to

settlement . . . the opened area ha[d] lost its reservation status." *Id.* at 586-87.  In determining that Congress sought to diminish the reservation, the Court scrutinized congressional intent underlying each act in conjunction with "the surrounding circumstances and the legislative history." *Id.* at 586-87 (citation and quotation omitted).

Relevant to the issues framed by the parties' pleadings is that the analysis in a treaty interpretation claim does involve the consideration of "jurisdictional history." *Id.* at 603.  In *Rosebud Sioux*, the Court acknowledged the "unquestioned actual assumption of state jurisdiction over the unallocated lands" in a disputed territory. *Id.*  The Court also noted "the fact that neither Congress nor the Department of Indian Affairs has sought to exercise its authority over [the state's] authority . . . [and the] longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian both in population and in land, use, not only demonstrates the parties' understanding of the meaning of the [congressional action], but has created justifiable expectations . . . ." *Id.* at 604-05.  The Supreme Court reasoned that the state's assumption of jurisdiction coupled with the federal government's absence support the conclusion that Congress intended to diminish the reservation. *Id.* at 605 ("We are simply unable to conclude that the intent of [Congress] was other than to disestablish").

Thus, *Rosebud Sioux* and related cases assure that the justifiable expectations of the affected parties to the treaties, based upon events that have occurred after the treaties themselves have been ratified, should be considered as they may be relevant to Congress's intention.

VIII

Defendants acknowledge that the United States has historically been exempt from time-based equitable defenses – generally and with respect to Indian treaty claims.  For instance, the United

-28-

States Supreme Court noted that "a strict rule against estoppel" has been asserted against the federal government from as early as 1813. *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990) (citing *Lee v. Munroe & Thornton*, 11 U.S. 366 (1813)); *see also Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917). In 1824, the Court similarly acknowledged the "general principle . . . that laches is not imputable to the Government." *United States v. Kirkpatrick*, 22 U.S. 720, 735 (1824); *see also United States v. Summerlin*, 310 U.S. 414, 416 (1940); *see also Hatchett v. United States*, 330 F.3d 875, 887 (6th Cir. 2003).[9]

Defendants do not dispute that traditional equitable defenses are ineffective against the federal government when a party seeks to enforce an Indian treaty or enforce its jurisdiction relevant to Indian country. *See, e.g., Bd. of Comm'r v. Jackson*, 308 U.S. 350-51 (1939). Indeed, Defendants do not materially dispute that time-based equitable defenses have been ineffective against the United States, acting in its sovereign capacity and on behalf of an Indian tribe, to enforce Indian rights. *See Mille Lacs Band of Chippewa Indians v. State of Minn.*, 853 F.Supp. 1118, 1124 (D. Minn. 1994); *see also United States v. State of Wash.*, 157 F.3d 630, 649 (9th Cir. 1998). Moreover, "[e]stoppel does not run against the United States when it acts as trustee for an Indian tribe." *State of N.M. v. Aamodt*, 537 F.2d 1102, 1110 (10th Cir. 1976); *see also United States v. City of Tacoma*, 332 F.3d 574, 581-82 (9th Cir. 2003).

Defendants do assert, however, that the Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005), categorically shifted long-standing

---

[9]    Plaintiffs acknowledge that laches may be asserted against the federal government when it acts in a business capacity rather than in its sovereign capacity. *See, e.g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 369 (1943); *see also United States v. Mandycz*, 447 F.3d 951, 964-65 (6th Cir. 2006). The United States acts in its sovereign capacity when it engages in conduct that a private party would be unable to engage in as a matter of law – e.g. to grant or remove the right of citizenship. *Id.*

jurisprudence. Defendants believe that *Sherrill* "altered the legal landscape" in Indian law claims such that Indian tribes are barred by equitable defenses when they request prospective relief contrary to contemporary "justifiable expectations" of a non-Indian population – public and private. *Id.* at 215 (citation omitted). Defendants also rely on the Second Circuit's later decision in *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005), which interpreted *Sherrill* to provide that equitable defenses may also be asserted against the United States in certain Indian possessory land claims. The United States and the Saginaw Chippewa, on the other hand, believe that *Sherrill* and *Cayuga* are factually distinguishable and, thus, inapplicable. Indeed, the United States contends that *Cayuga* is wrongly decided and should not be applied as the law in this Circuit.

## A

In *Sherrill*, the Oneida Indian Nation ("OIN") initiated the action, seeking exemption from state imposed property taxes on discrete parcels of land within the historic reservation. 544 U.S. at 202. The United States was not a party to the case. The parcels of land were previously possessed by OIN in 1805, but it transferred almost all its ownership interest to the state government, in violation of federal Indian policy.[10] *Id.* at 204. OIN reacquired the parcels in 1997 and 1998, and asserted that reacquisition "revived [OIN's] ancient sovereignty piecemeal over each parcel." *Id.*

The Court rejected OIN's request for redress for present and future relief that would disrupt local governance and held that:

> Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the [OIN's] long delay in seeking judicial relief against parties other than the United States, we hold that [CIN] cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The [OIN] long ago

---

[10] The OIN's transfer of Indian land to the state government, absent the approval of the federal government, violated the Nonintercourse Act. Act of July 22, 1790, ch. 33, 1 Stat. 137.

> relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.

*Id.* at 202-03. As a starting point, the Court noted that the United States had either "largely accepted or was indifferent to, New York's governance of the land in question and the validity *vel non* of [OIN's] sale to the State." *Id.* at 214. In the 200 year period between the transfer to the state and OIN's reacquisition of the land, "justifiable expectations" developed that the state retained the authority to exercise regulatory jurisdiction over an area and population that had largely become non-Indian. *Id.* at 215-16 (citing *Rosebud Sioux*, 430 U.S. at 604-05). As a result, laches was appropriately asserted by the state and the Court observed that "[w]hen a party belatedly asserts a right to present and future sovereign control over territory, longstanding observances and settled expectations are prime considerations." *Id.* at 218. Despite the fact that OIN sought only exemption from property taxes, not additional limitation of the state's jurisdictional authority, the Court believed that the impossibility doctrine still applied because "the unilateral reestablishment of present and future Indian sovereign control . . . would have disruptive practical consequences . . . ." *Id.* at 219. If the OIN was granted the requested relief, the Court believed that "[a] checkerboard of alternating state and tribal jurisdiction in New York State – created unilaterally at OIN's behest – would seriously burden the administration of state and local governments and would adversely affect landowners neighboring the tribal patches." *Id.* at 219-20 (citation and quotations omitted).

In concluding that laches and impossibility were applicable, the Court noted that Congress had provided a statutory mechanism for the acquisition of lands on behalf of Indian tribes that would be free from local and state taxation. *Id.* at 220 (citing 25 U.S.C. § 465). Ultimately, OIN's "long delay in seeking equitable relief against New York and its local units, and developments in the city

of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance [the] suit [sought] to unilaterally [] initiate." *Id.* at 221.

In *Cayuga*, the Second Circuit was presented with the question of whether, in light of the Supreme Court's holding in *Sherrill*, equitable defenses barred Cayuga Indian Nation of New York's ("CIN") claim seeking monetary damages and also barred the United States's claims as a trustee on CIN's behalf. *Cayuga*, 413 F.3d 266. CIN's complaint sought, inter alia, a declaration "that plaintiffs are the owners of and have the legal and equitable title and the right of possession to all of the land in the Original Reservation and that the Court restore plaintiffs to immediate possession of all portions of the subject land claimed by any defendant or member of the defendant class and eject any defendant claiming their chain of title through the 1795 and 1807 New York State treaties." *Id.* at 269. In two treaties executed in 1795 and 1807, CIN transferred their "Original Reservation," a 64,015 acre "swath of land," to the State of New York for cash payments without ratification by the federal government, in violation of the Nonintercourse Act. *Id.* at 268-69. Prior to reaching the Second Circuit, the district court concluded that laches was ineffective because Second Circuit authority "was clear that claims brought by Indian tribes in general . . . should be held by courts to be timely, and therefore not barred by laches, is, at the very least, such a suit would have been timely if the same had been brought by the United States." *Id.* at 270.

After the district court determined laches to be inapplicable, the United States intervened as a plaintiff and on behalf of CIN.[11] *Id.* at 270-71. The United States's intervening complaint sought a declaration that CIN was entitled to possession, ejectment of current residents, and damages. *Id.*

---

[11] The United States intervened for the purpose of defeating defendants' reliance on the Eleventh Amendment.

at 271.   Ultimately, the district court awarded money damages and pre-judgment interest approaching $250 million for unpaid rents.  *Id.* at 271-73.

The Second Circuit relied on *Sherrill* in concluding that equitable defenses barred Plaintiffs' claims – those asserted by CIN and the United States.  The court reasoned that the *Sherrill* Court was concerned with the "disruptive nature of the claim itself."  *Id.* at 274 (citation omitted).  Although the district court awarded money damages, the Second Circuit found CIN's claim to be a possessory claim grounded in ejectment.  *Id.*  Despite the fact that *Sherrill* addressed a claim to exercise its authority to tax rather than a claim seeking possession of land, the Second Circuit reasoned that the same equitable considerations applied because each was "indisputably disruptive."  *Id.* at 275.

The Second Circuit applied the "factors" considered in *Sherrill*, as follows:

> Inasmuch as the instant claim, a possessory land claim, is subject to the doctrine of laches, we conclude that the present case must be dismissed because the same considerations that doomed the [OIN's] claim in *Sherrill* apply with equal force here. These considerations include the following: generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation; at least since the middle years of the 19th century, most [members of OIN] have resided elsewhere; the longstanding, distinctly non-Indian character of the area and its inhabitants; the distance from 1805 to the present day; [OIN's] long delay in seeking equitable relief against New York or its local units; and developments in [the area] spanning several generations.  We thus hold that the doctrine of laches bars the possessory land claim presented by [CIN] here.

> * * *

> To summarize: the import of *Sherrill* is that "disruptive," forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches.  Insofar as [CIN's] claim in the instant case is unquestionably a possessory land claim, it is subject to laches.  The District Court found that laches barred the possessory land claim, and the considerations identified by the Supreme Court in *Sherrill* mandate that we affirm the District Court's finding that the possessory land claim is barred by laches.  The fact that, nineteen years into the case, at the damages stage, the District Court substituted a monetary remedy for plaintiffs' preferred remedy of ejectment cannot salvage the claim, which was subject to dismissal *ab initio*.  To frame this point a different way: if [CIN] filed this complaint

today, exactly as worded, a District Court would be required to find the claim subject to the defense of laches under *Sherrill* and could dismiss on that basis.

*Id.* at 277-78 (internal citations and quotations omitted).

Next, the court concluded that the United States was also subject to laches. *Id.* at 278. While observing that the United States is traditionally not subject to the defense of laches, the court concluded that it is not a per se rule. The court found three scenarios when laches might be appropriately asserted against the United States:

> First, that only the most egregious instances of laches can be used to abate a government suit; second, to confine the doctrine to suits against the government in which . . . there is no statute of limitations; and third, to draw a line between government suits in which the government is seeking to enforce either on its own behalf or that of private parties what are in the nature of private rights, and government suits to enforce sovereign rights, and to allow laches as a defense in the former class of cases but not the latter.

*Id.* at 278-79. The Second Circuit concluded that the facts of the case fell within all three exceptions and that the doctrine of laches could be applied against the United States. *Id.* at 279. First, the United States's delay could not have been longer, as the underlying events occurred near the government's inception. *Id.* Second, an applicable statute of limitations did not exist until more than 150 years after the action accrued. *Id.* Third, the United States's participation was in support of CIN's private rights, not for the purpose of protecting its rights as a sovereign entity. *Id.*

The *Cayuga* dissent disagreed with the majority's conclusion that the United States, acting in its sovereign capacity, is not "per se" exempt from laches and other time-based limitations. *Id.* at 286 (Hall, J., dissenting in part and concurring in part). While acknowledging that laches may be applicable against the United States when it acts in business and commerce, the dissent contended that the exceptions discussed in *Clearfield Trust*, 318 U.S. at 369, are inapplicable when the United States acts in its sovereign capacity. *Id.* at 286. The dissent reasoned as follows:

> [T]he *Clearfield Trust* Court limited the application of laches to those claims deriving not from the sovereign authority and rights of the United States but, instead, relating to the actions of the United States with respect to business and commerce. In the instant case, the United States is not a commercial actor. Here, it acts both to enforce a public right [and] to protect interests of its Indian wards. It is clear, then, that the United States's claims in this case, both on its own behalf and as trustee to the Tribe, are not barred by laches.

*Id.* at 287 (internal citations and quotations omitted). Thus, the exceptions discussed in *Clearfield Trust* did not provide the court, in the dissent's view, with "the authority to craft a federal common law defense of laches against an Indian land claim sought by the United States." *Id.* at 288.

The dissent reasoned the *Sherrill* holding only applies to claims seeking similarly disruptive equitable relief. *Id.* at 288-90. First, the *Sherrill* Court addressed the applicability of laches "framed by the nature" of the requested equitable relief. In *Cayuga*, CIN sought both ejectment and monetary damages. The dissent interpreted the discussion of specific equitable relief in *Sherrill* to indicate that the Supreme Court considered laches "in the context of the specific equitable relief sought in that case." *Id.* at 289 (citing *Sherrill*, 544 U.S. at 210-211) (noting a "sharp distinction between the existence of a federal common law right to Indian homelands . . . and how to vindicate that right") (citation omitted). Consequently, in the dissent's view, *Sherrill* "confines" the availability of laches to "certain relief"that is sufficiently "disruptive." *Id.* at 290 (agreeing that repossession as an equitable remedy, disruptive in nature, is to be barred by laches). The award of monetary damages for violation of a clear right, however, remains exempt from laches. *Id.* Laches, in the dissent's view, became an available remedy in *Sherrill* only because of the uniquely disruptive remedy the plaintiff sought.

Moreover, the dissent categorically denied the court's "authority to craft a federal common law defense of laches against an Indian land claim sought by the United States." *Id.* at 288. The

dissent rejected the suggestion that even if applicable, none of the three recognized circumstances where laches might be available apply against the government was present. *Id.* (citing *United States v. Adm. Enter., Inc.*, 46 F.3d 670, 673 (7th Cir. 1995)). First, while nearly 200 years, "the nature of the delay" supported excusing the untimeliness of CIN requesting relief. *Id.* Second, Congress had enacted a statute of limitations pertaining to similar claims for money damages, which is incongruent with applying the doctrine of laches. *Id.* "When there is no statute of limitations in the picture, the law, including federal common law, relies upon the doctrine of laches to protect the recipient of the summons from unreasonable delay in enforcement." *Adm. Enter.*, 46 F.3d at 672. Thus, a statute of limitations barring money damages "supports the conclusion that laches cannot be applied to bar a claim for money damages, but may be applied to bar a claim for equitable relief." *Cayuga*, 413 F.3d at 288, n. 11 (citing 28 U.S.C. § 2415(a)). Third, when acting on behalf of an Indian tribe, the United States does not enforce a "private" interest. *Id.* at 288. Rather, "the Supreme Court has found that, insofar as it acts on behalf of Indian tribes, the United States acts to protect a public interest, entirely dissimilar from the private interest served where the United States pursues an action based on its purely commercial endeavors." *Id.* at 288 (citing *United States v. Minn.*, 270 U.S. 181, 196 (1926)). The dissent reasoned, ultimately, that *Sherrill*'s impact to be "that the nature of forward-looking, disruptive remedies generally will serve as equitable considerations that can bar such equitable remedies as re-possession, even against the United States," but such considerations are inconsequential against the United States when the parties seek remedies at law *Id.*

## C

The plaintiffs in *Sherrill* and *Cayuga* each sought judicial relief based upon violations of the Nonintercourse Act's prohibition against a state's acquisition of land from Indian tribes without the

acquiescence of the federal government. The plaintiff asserted in *Sherrill* that the "cession of 100,000 acres to the State of New York in 1795 violated the Nonintercourse Act and thus did not terminate [the plaintiff's] right to possession." 544 U.S. at 197. Remedially, the plaintiff sought declaratory and injunctive relief prohibiting local taxation of land the tribe had recently purchased on the open market because "it has unified fee and aboriginal title and may now assert sovereign dominion over the parcels." *Id.* at 199. Similarly, the plaintiff in *Cayuga* asserted that the 1795 and 1807 "treaties" with the State of New York were not ratified pursuant to the Treaty Clause of the United States Constitution and, thus, the plaintiff too had a continuing right to immediate possession warranting damages approaching $250,000,000.00. Importantly, the Court in *Sherrill* observed that "[t]he wrongs of which [the plaintiff] complains occurred during the early years of the Republic" and were followed by two centuries of governance by county and municipal governments. *Id.* The action brought by the Saginaw Chippewa and the United States in this case is different.

First, quite apparent is the fact that Defendants' incremental assumption of governmental responsibilities occurred sometime after the treaties in 1855 and 1864. Clearly, the challenged conduct is not the same sort of distinct ancient wrong arising from the early days of the Republic that was at issue in either *Sherrill* or *Cayuga*. On the contrary, the parties concede that all chronologically relevant proofs will relate to and post-date the treaties themselves.

Second, and of greater significance, is the character of the legal issues framed in *Sherrill* and *Cayuga*. Each arose from violations of the Nonintercourse Act, where Congress defined the substantive prohibition on land transactions with tribes but did not provide a remedy. By reason of that fact, the courts were reasonably, indeed necessarily, involved in the task of fashioning a remedy. While a decision on the merits in favor of the Saginaw Chippewa and the United States in this case

may require some exercise of discretion, the remedy will be closely tied to the treaties and later congressional action. The undertaking will be a decidedly different task than fashioning a remedy for a two century old violation of law out of whole cloth.

Third, there is a dramatic difference between the character of the claim advanced by Plaintiffs and also of the character of relief that distinguishes the immediate case from *Sherrill* and *Cayuga*. The plaintiff in *Sherrill* sought a determination that local governments could not collect taxes because of the reunification of title to the real estate two centuries later. In *Cayuga,* the plaintiff sought enforcement of a judgment approaching a quarter of a billion dollars, again based upon it "assert[ing] a continuing right to immediate possession as the basis of all their claims, and have always sought ejectment of the current landowners as their preferred form of relief." 413 F.3d at 274. The plaintiffs' actions, at their core, sought resurrection of an ancient claim to the land. Plaintiffs claims here do not arise from a claim of entitlement to the land or damages from its loss. Plaintiffs have expressly eliminated any request for relief from property taxes and have expressly stipulated that they do not seek to govern persons who are not members of the tribe. The Saginaw Chippewa's claims for self-government, supported by the United States, is grounded on the assertion that the issues were resolved in the treaties or by later congressional action.

Defendants have also argued, with some merit, that the relief Plaintiffs seek may be disruptive and that fact alone justifies consideration of equitable defenses and application of *Sherrill*, despite the distinct difference in the character of the claims and the remedies sought. Once again, however, there is a fundamental difference. The disruption at issue in *Sherrill* would have arisen from the Court's task of fashioning a judicial remedy for the ancient wrongs. In the immediate case, if a remedy is appropriate, any disruption will follow from the treaties themselves and any act of

diminishment thereafter by Congress.

Moreover, the exceptions to the general rule, that laches may not be asserted as a defense to the United States, are not present. Here, it can not be reasonably disputed that the United States is acting in its sovereign capacity, seeking to enforce its own rights under the treaties and also in its trust capacity to enforce the treaties on behalf of the Saginaw Chippewa. This is not an instance where the United States is conducting business or commerce similar to a private party. Instead, the United States is seeking to enforce an Indian treaty, a power exclusively reserved to the federal government by the Constitution. Such conduct falls squarely within its exclusive exercise of sovereign power. Thus, the commerce exception advanced by Defendants to the general rule, that equitable defenses may be advanced against the United States, does not apply here.

Finally, as a matter of constitutional law, the United States has brought this action not only in its trust capacity but in its sovereign capacity under the Treaty Clause. It would be remarkable to hold that the commitments and obligations of the United States embodied in its treaties may be altered by a judicially endorsed equitable defense based upon the State of Michigan's inconsistent incremental exercise of governmental authority over time. Moreover, Congress presented the State of Michigan an opportunity to exercise civil and criminal law jurisdiction over the Saginaw Chippewa by passage of Public Law 280. Counsel conceded during argument that the State of Michigan elected not to do so. The analytical framework outlined in *Rosebud Sioux*, with its focus on congressional intent as expressed in the treaties and later legislation provides the appropriate analytical framework for the resolution of this case. Extending *Sherrill*'s holding to defeat the interpretation of Treaties approved by Congress would fundamentally conflict with the provisions of the United States Constitution that allocate those responsibilities to Congress and the executive

branch of the United States government.

These principles persuade the Court that, as a matter of law, the time-based equitable defenses Defendants wish to advance are inapplicable to the issues here presented and may not otherwise be advanced against the United States's enforcement of its treaties. Consequently, Defendants may not rely on the time-based equitable defenses of laches, estoppel, acquiescence, or impossibility. In addition, testimony and proofs offered in support of these affirmative defenses are irrelevant. Thus, the United States's and the Saginaw Chippewa's motions should be granted.

One additional conclusion is warranted from consideration of the parties' motions generally and Defendants' papers specifically. Defendants have identified a number of witnesses they wish to present in support of their contention that the relief sought by the Saginaw Chippewa and the United States would be disruptive, if not impossible and impracticable. Indeed, the Saginaw Chippewa characterized the subject testimony to be offered by these witnesses as "future effect" testimony. While the affect of the decision granting the Saginaw Chippewa's motion to strike and the United States's motion in limine and for partial summary judgment will be to exclude the testimony from the Court's consideration of the treaty based question of the reservation and its boundaries, the testimony may become relevant if the Saginaw Chippewa and the United States prevail on the merits. Indeed, as the United States emphasizes, state and municipal governments operate within Indian country across the country, most often by compact on jurisdictional questions. The issues attendant to implementing a remedy, if the Court is called on to address them, will implicate decidedly different questions.

Thus, a distinct difference between the substantive question and any potential remedy exists. It is appropriate to bifurcate the adjudication of substantive claims from remedial implications, if

same should be necessary. Fed. R. Civ. P. 42(b). The parties shall each file an amended witness list, identify all witnesses they contend may offer relevant testimony consistent with this opinion and the rationale for their testimony so that any challenges may be resolved. Any party that disputes the relevancy of any potential witness, shall file a motion in limine setting forth the basis for the challenge. The parties shall also appear at a case management conference to address the challenges and finalize a discovery plan.

IX

Accordingly, it is **ORDERED** that Defendant Michigan Defendants' motion to amend [Dkt. # 62, 63], Defendant-Intervenor County of Isabella's motion to amend [Dkt. # 70], and Defendant-Intervenor City of Mt. Pleasant's motion to amend [Dkt. # 69] are **GRANTED**. Each answer may be amended to allege the contemplated affirmative defenses.

It is further **ORDERED** that Plaintiff Saginaw Chippewa's motion to strike [Dkt. # 73] is **GRANTED** and Plaintiff United States's motion in limine and for partial summary judgment [Dkt. # 67] is **GRANTED**. Defendants may not rely on, or advance any evidentiary support for, the time-based equitable defenses of laches, estoppel, acquiescence, or impossibility.

It is further **ORDERED** that Plaintiff United States's motion to strike Defendants' exhibits [Dkt. # 97] is **DENIED** and Defendant State of Michigan's motion to file a sur-reply [Dkt. # 113] is **DENIED** as moot.

It is further **ORDERED** that the action shall be **BIFURCATED** into a phase to adjudicate substantive issues and, if necessary, a remedial phase.

It is further **ORDERED** that the parties shall file amended witness lists consistent with this opinion and order on or before **October 31, 2008**. Challenges to any witnesses shall be filed on or

before **November 14, 2008**.  The parties shall not file replies.  Counsel for the parties shall appear

for a case management conference and hearing on **Wednesday, December 17, 2008 at 2:00 p.m.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated:  October 22, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on October 22, 2008

s/Tracy A. Jacobs
TRACY A. JACOBS