UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE OF
MICHIGAN,

        Plaintiff,

-and-

UNITED STATES OF AMERICA,

        Plaintiff-Intervenor,

v.

JENNIFER GRANHOLM, *Governor of the
State of Michigan*, MIKE COX, *Attorney General
of the State of Michigan*, JAY B. RISING,
*Treasurer of the State of Michigan*,

        Defendants,

-and-

CITY OF MT. PLEASANT and COUNTY OF
ISABELLA,

        Defendant-Intervenors.
_____/

Case Number 05-10296-BC
Honorable Thomas L. Ludington

**OPINION AND ORDER GRANTING UNITED STATES'S MOTION IN LIMINE AND
GRANTING SAGINAW CHIPPEWA'S MOTION TO STRIKE**

On November 21, 2005, Plaintiff Saginaw Chippewa Indian Tribe of Michigan (the "Saginaw Chippewa") filed a complaint seeking a declaratory judgment defining certain of its rights and obligations pursuant to an 1855 treaty and an 1864 treaty with the United States. On January 30, 2009, Plaintiff-Intervenor United States of America (the "United States") moved to limit the introduction of testimony from what has become characterized as "jurisdictional-fact" witnesses. The Saginaw Chippewa filed a related motion seeking to strike the "*Rosebud* statutory-diminishment

defense" and supporting witnesses. Dkt. # 150-51. By way of stipulation, the parties agreed that the treaties between the Saginaw Chippewa and the United States government were not diminished or disestablished by any later Act of Congress. Dkt. # 149. Consequently, in the absence of an Act of Congress amending or abrogating either treaty, Plaintiffs maintain that United States Supreme Court precedent and federal appellate authority establishes a framework for treaty interpretation, which limits the inquiry to an examination of the language of the treaties and the contemporaneous historical context of the parties to the treaty.

Defendants Governor Jennifer Granholm, Attorney General Mike Cox, and Treasurer Jay B. Rising ("Michigan Defendants" or "State of Michigan"), Defendant-Intervenor County of Isabella ("Defendant County"), and Defendant-Intervenor City of Mt. Pleasant ("Defendant City," collectively "Defendants") contend that the Court should consider "jurisdictional facts" relating to events occurring significantly later than the treaties. Local and state authorities assert that the present-day understanding of the treaties and the contemporary conduct of the parties are also probative of the treaties and the parties' intentions in 1855 and 1864. The Court will **GRANT** Plaintiffs' motions because persuasive authority directs that the 1855 and 1864 treaties are governed by their language and the signatories' intent at the time the treaties were entered.

I

The amended complaint seeks to enforce rights under the 1855 and 1864 treaties, including limiting Defendants from asserting criminal or civil regulatory jurisdiction over the Saginaw Chippewa, or interfering with their rights under federal law relating to Indian County. Dkt. at ¶ 45. Defendants contend that the treaties entered in 1855 and 1864 between the "Chippewa of Saginaw"[1]

---

[1] The Saginaw Chippewa contends that it is the successor of interest to the "Chippewa of Saginaw" that entered into the treaties.

and the United States did not establish a reservation. *See* Treaty with the Chippewa of Saginaw, Etc., U.S.-Chippewa, Aug. 2, 1855, 11 Stat. 633; *see also* Treaty with the Chippewa of Saginaw, Swan Creek, and Black River, U.S.-Chippewa, Oct. 18, 1864, 14 Stat. 657. In the event a reservation was established, Defendants allege the treaties themselves provided for the diminishment of the reservation.

The first substantive issue of this litigation arose when Plaintiffs moved to strike the equitable defenses of laches, estoppel, impossibility, and acquiescence on the basis that those defenses could not be asserted without the consent of the United States. Among other things, Defendants' answers generally advanced a theory that the Saginaw Chippewa delayed asserting, either negligently or knowingly, certain treaty rights for more than 100 years. Defendants understood the treaties to confer criminal and civil jurisdiction to the state and municipal governments and believed that their view should be recognized because of that delay. Similarly, Defendants also asserted that the relief sought by the Saginaw Chippewa was impracticable and impossible to implement, regardless of the reason for the Saginaw Chippewa's delay.

On October 22, 2008, the Court granted the motions and barred the advancement of time-passage based equitable defenses. Dkt. # 121 at 41. In that opinion, however, the Court noted that "the justifiable expectations of the affected parties to the treaties, based upon events that have occurred after the treaties themselves have been ratified, should be considered as they may be relevant to Congress's intention." *Id.* at 28-29 (citing *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977)). The Court directed the parties to amend their witness lists to reflect the exclusion of the time-based equitable defenses. *Id.* at 42. The Court also bifurcated the case to address substantive legal issues in Phase I and, if necessary, remedial issues in Phase II. *Id.*

On December 17, 2008, the Court held a status conference, which primarily addressed the amended witness lists. *See* dkt. # 148. Plaintiffs expressed an intent to file motions to exclude testimony that Plaintiffs believed was irrelevant in light of the exclusion of time-passage based opinions. *Id.* At the Court's direction, the parties submitted a stipulation narrowing the scope of these motions, which provided as follows:

> 1. Defendants do not allege that any Act of Congress post-dating the Treaties of 1855 and 1864 diminishes or disestablishes the Isabella Reservation (as the Plaintiffs allege it exists).
>
> 2. Defendants contend, however, that if the Isabella Reservation (as the Plaintiffs allege it exists) was in fact established by the Treaties of 1855 and 1864, it was diminished by operation of the 1855 and 1864 Treaties themselves, and Defendants may argue that Acts of Congress after 1864 are evidence that the Isabella Reservation (as the Plaintiffs allege it exists) has been diminished.
>
> 3. The parties agree that the broad legal question the Court must address before trial is whether the treaty or treaties that allegedly established a reservation can serve the same legal function as a post-treaty Act of Congress that diminishes a reservation. Answering this question will determine whether the diminishment analysis set forth in *Rosebud Sioux Tribe v. Kneip* and its progeny (regarding when post-treaty congressional acts can diminish reservation boundaries) applies to a case where there is no post-treaty congressional act that allegedly diminishes reservation boundaries.
>
> 4. The parties agree that best way to resolve the legal question stated above is for the Plaintiffs to file motions to strike the Defendants' diminishment defense and motions in limine to preclude testimony by the witnesses Defendants have generally identified as *Rosebud* jurisdictional-fact witnesses.

Dkt. # 149. Thereafter, Plaintiffs filed motions in limine and to strike that are presently before the Court. Dkt. # 150-51. The United States seeks to exclude the testimony of Kenneth Darga,[2]

---

[2] According to the State of Michigan's witness list, Darga is a State Demographer and will provide testimony "regarding percentage of land held as Indian Country, percentage of Saginaw Chippewa Indian Tribe members in Isabella County, and other demographic information." Dkt. # 125 at ¶ 2.

Anthony C. Olkowski,[3] and Don Seal (to the extent he offers testimony beyond interpretation of the treaties).[4] Dkt. # 150 at 8. Likewise, the Saginaw Chippewa seek to exclude any witnesses that provide testimony of "modern demographic or jurisdictional facts" in Phase I. Dkt. # 151 at 7. In addition, the Saginaw Chippewa move to strike Defendant's diminishment or disestablishment defenses "to the extent that Defendants rely on a statutory-diminishment theory." *Id.* at 2.

II

A

"Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). A district court retains broad discretion in determining the admissibility of evidence. *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006). Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." It is axiomatic that irrelevant evidence is inadmissible. Fed. R. Evid. 402. "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *United States v. Franco*, 484 F.3d 347, 351 (6th Cir. 2007) (citations omitted).

B

A court, acting sua sponte or on a party's motion, may strike any "insufficient defense" from

---

[3] According to the State of Michigan's witness list, Olkowski will provide testimony "regarding percentage of land held as Indian Country, percentage of Saginaw Chippewa Indian Tribe members in Isabella County, and other mapping and geographic information." Dkt. # 125 at ¶ 3.

[4] According to the State of Michigan's witness list, Seal is a Saginaw Chippewa Tribal Planning Department, "with knowledge of tribal land maps." Dkt. # 125 at ¶ 8.

a pleading. Fed. R. Civ. P. 12(f). "A motion to strike under Rule 12(f) is proper where it will eliminate spurious issues before trial and streamline the litigation." *Ameriwood Indus. Int'l Corp. v. Arthur Anderson & Co.*, 961 F.Supp. 1078, 1083 (W.D. Mich. 1997) (citation omitted). A party must demonstrate, however, that an affirmative defense "cannot succeed under any circumstances." *Id.* (citation omitted).

### III

### A

Before addressing the legal issue framed by the parties' stipulation and the motions in limine and to strike, the Court's last opinion should be revisited. Previously, the Court considered the viability of equitable defenses predicated on Plaintiffs' alleged inactivity over the passage of time. *See* dkt. # 121. The theories of laches, equitable estoppel, acquiescence, impossibility and impracticability are inapplicable because each relies on events that post-date and are extraneous to the treaties. *See id.* at 14, 40-41. Supplementing that conclusion was the Court's consideration of the United States Supreme Court's decision in *Rosebud Sioux*, 430 U.S. 584, that some conduct of the parties post-dating the treaties would be admissible as instructive of the parties' intentions in the treaties themselves. *See* dkt. # 121 at 27-28.

In *Rosebud Sioux*, the United States Supreme Court considered whether three Acts of Congress diminished a reservation established by a treaty because "congressional determination to terminate (an Indian reservation) must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." 430 U.S. at 585-86 (quoting *Mattz v. Arnett*, 412 U.S. 481, 505 (1973)). The tribe sought a declaration that its reservation was not diminished by Congress's post-treaty legislation permitting the non-Indian settlement of unallocated land. *Id.*

at 585. In determining that Congress sought to diminish the reservation, the Court was "guided by well-established legal principle" that congressional intent "control[s]." *Id.* at 586. While review of the Act of Congress supported the conclusion that Congress intended to diminish the reservation's boundaries, the Court also considered the fact that the State assumed jurisdiction over the disputed areas after the Act of Congress. *Id.* at 603-04. The fact that "Congress nor the Department of Indian Affairs []sought to exercise authority," and that the State did, was significant to the Court because it "demonstrate[d] the parties' understanding of the meaning of the Act." *Id.*

This Court's previous opinion concluded that the underlying factual considerations relevant to the time-based equitable defenses would receive some attention, reasoning as follows: "*Rosebud Sioux* and related cases assure that the justifiable expectations of the affected parties to the treaties, based upon events that have occurred after the treaties themselves have been ratified, should be considered as they may be relevant to Congress's intention." Dkt. # 121 at 28. In retrospect, however, *Rosebud Sioux* concerned a later congressional act amending the relevant treaties, and as emphasized by the parties' stipulation, it presented a different problem of construction. Thus, the framework set forth in *Rosebud Sioux* is not directly applicable to the interpretive question framed by the parties.

B

In absence of an Act of Congress, interpretation of a treaty focuses on the language of the treaty and the intent of the parties as extrapolated from contemporaneous history. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999). In *Mille Lacs*, the Chippewa entered a treaty ("1837 Treaty") transferring land to the United States while preserving hunting, fishing, and gathering rights on those lands, otherwise referred to as usufructuary rights. *Id.* at 176. In the

succeeding decade, local pressure mounted to remove the Chippewa from the lands and state authorities attempted to prompt action on the national level to do so. *Id.* at 177-78. In 1850, President Zachary Taylor issued an executive order that expressly revoked the usufructuary rights and authorized the Chippewa's removal from the land. *Id.* at 179. In 1855, the Chippewa and the United States executed another treaty ("1855 Treaty") that ceded land in Minnesota and "fully and entirely relinquish[ed] and convey[ed] to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in" the land. *Id.* at 184. Finally, Minnesota was admitted to the Union in 1858 by an Act of Congress, but the legislation providing for its admission did not address Indian-treaty rights. *Id.* at 185 (citing Act of May 11, 1858, 11 Stat. 285).

In 1990, the Chippewa sought a declaratory judgment from a federal court recognizing its usufructuary rights. *Id.* Minnesota argued that those rights were extinguished by the executive order, Minnesota's admission into the Union, and the 1855 Treaty. *Id.* The district and the appellate courts both concluded that these measures did not extinguish the Chippewa's usufructuary rights. *Id.* at 186-88. The Supreme Court agreed with this conclusion and the manner of its inquiry is relevant to the instant case.

First, the Court analyzed the executive order, determining it was ineffective because the removal provision was not authorized by constitutional or statutory authority. *Id.* at 189-90. Moreover, the 1837 treaty itself did not contemplate removal and "there was no discussion of removal during the [t]reaty negotiations." *Id.* at 189. Consequently, the executive order, which included the provision revoking the usufructuary rights, was invalid. *Id.* at 192-94. While the Court noted that the 1837 treaty permitted the extinguishment of the usufructuary rights by executive

-8-

order, the inclusion of the removal provision nullified the entire executive order. *Id.* at 194.

Next, the Court analyzed the 1855 treaty. After reviewing "the history, purpose, and negotiations of [the 1855 treaty]," the Supreme Court concluded that the 1855 treaty did not abrogate the Chippewa's usufructuary rights. *Id.* at 202. The Court scrutinized the treaty's language, emphasizing that it did not expressly mention hunting, fishing, or gathering rights and found "[t]hese omissions [] telling because the United States treaty drafters had the sophistication and experience to use express language for the abrogation of treaty rights." *Id.* at 195. The Court also "look[ed] beyond the written words to the larger context that frames the [t]reaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.' " *Id.* at 196 (quoting *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943) (further citation omitted)).

Insight into the negotiating parties' understanding of the treaty's terms, especially that of the Indian tribe, illuminates a treaty's intended purpose. *Id.* Emphasis is placed on an Indian tribe's understanding because courts "interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Id.* (citing *Washington v. Wash. State Commercial Passenger Fishing Vessel Assn.*, 443 U.S. 658, 675-676 (1979) and *United States v. Winans*, 198 U.S. 371, 380-381(1905)). For example, the record demonstrated that Chippewa negotiators did not contemplate the abrogation of their usufructuary rights in the 1855 treaty. *Id.* at 198.

The Court also examined the legislative history of the underlying Act of Congress that authorized the negotiations to acquire the land. *Id.* at 196-97. Finally, the Court rejected the argument that the admission of Minnesota abrogated the usufructuary rights because Congress made no indication that it sought to do so when passing the admission act. *Id.* at 202-03.

In response, Defendants advance appellate authority for the proposition that jurisdictional facts may be admitted to interpret the parties' intent when executing a treaty. *See Shawnee Tribe v. United States*, 423 F.3d 1204 (10th Cir. 2005). Recognizing that reservation diminishment is evaluated on a case-by-case basis, the *Shawnee* court employed a three-step analysis utilized by the Supreme Court when considering the effect of a congressional surplus land act on the terms of an Indian treaty. *Id.* at 1220-21 (citing *Solem v. Bartlett*, 465 U.S. 463, 468-69 (1984)). The first two steps – analysis of the treaty's language and the historical context surrounding its formation – are common with that in *Mille Lacs*. *Id.* at 1221 (citing *Solem*, 465 U.S. at 470-71).

And "to a lesser extent," the *Shawnee* court also considered "the subsequent treatment of the area in question and the pattern of settlement there as clues to the parties' earlier intentions," *id.* (citing *Solem*, 465 U.S. at 471), including "federal and local authorities' approaches to the lands in question and to the area's subsequent demographic history." *Id.* at 1222 (citing *Solem*, 465 U.S. at 471-72 n.13). The Court acknowledged the "unorthodox and potentially unreliable" nature of the inquiry, *id.* (citing *Solem*, 465 U.S. at 471-72 n.13) and observed that it "will not substitute for failure of the instrument's language or contemporaneous history to evidence an intention to terminate all or some of the reservation." *Id.* at 1223 (citing *Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1395-96 (10th Cir. 1990) (citing *Solem*, 465 U.S. at 472)). The record before that court indicated that the tribe vacated the reservation and few members of the tribe still remained, but that it was unclear whether the tribe was constructively removed by settlers. *Id.* at 1227-28 n.32. There is no indication that the Court considered other jurisdictional facts, and ultimately the court found the inquiry to have limited value. *Id.* at 1228.

C

*Rosebud Sioux* certainly supports the general notion that jurisdictional facts illuminate the "understanding" of the affected parties – federal and state governments and the tribe – with respect to the interpretation of a later congressional action, not a treaty. While not explicitly addressed, there is a key distinction. As the *Rosebud Sioux* Court noted, an Act of Congress is a unilateral act, whereby the tribe, or other affected parties for that matter, do not have direct input. 430 U.S. at 587. Indeed, Congress retains the authority to unilaterally abrogate a treaty. *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566 (1903).

In contrast, a treaty represents a meeting of the minds culminating with an agreement akin to a contract. *See, e.g.*, *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 391 (2006) (citing *Foster v. Neilson*, 27 U.S. 253, 314 (1829)). In the context of an Indian treaty, it is well settled that the terms are construed in favor of the tribe's interpretation. *See, e.g.*, *Wash. State Commercial*, 443 U.S. at 675-76 (citing *Jones v. Meehan*, 175 U.S. 1, 11 (1899)). When an Act of Congress is implicated, the tribe's view of the Act and its subsequent conduct (as well as state and federal governments') become relevant to deciphering Congress's intent.

The considerations in *Mille Lacs* implicitly support this conclusion. Throughout the balance of the *Mille Lacs* opinion, the Court focuses on the language and intent of each measure and does not consider post-dating events.[5] In a circumstance where no relevant Act of Congress is implicated, such as in *Mille Lacs*, the intent of outside parties is ultimately irrelevant. Consequently, evidence of later events does not necessarily illustrate the signatories' understanding of the treaty's

---

[5] While apparently not entering its analysis, the Supreme Court did note evidence that a federal official recognized the Chippewa's usufructuary rights in 1855, but later federal officials denied those rights at the end of the nineteenth century and beginning of the twentieth century. *Id.* at 182.

terms. The conclusion in *Mille Lacs* was predicated on the treaties, the relevant contemporary negotiations, and the parties' intent.

The *Rosebud Sioux* Court did evaluate supplemental facts concerning the affected parties' conduct, but did so to reach an understanding with respect to congressional intent – the Court's primary focus. In comparison to Congress's legislative authority, Indian tribes retained little bargaining power and few mechanisms to enforce the terms of the treaty. The treaty-interpretation framework employed in *Mille Lacs* acknowledges this difference. Ultimately, jurisdictional facts are not probative of the parties' interpretation of the treaty. *See also Ottawa Tribe of Okla. v. Ohio Dep't of Natural Res.*, 541 F. Supp. 2d 971, 980-86 (N.D. Ohio 2008) (examining text and parties intent to determine effect of a series of treaties).

Indeed, *Shawnee* provides some authority for this Court to consider jurisdictional facts, but that conclusion relies on applying the *Solem* factors to treaty interpretation. *Solem* considered the effect of the Cheyenne River Act, 35 Stat. 460, *et seq.*, one Act in a series of surplus land Acts passed by Congress. 465 U.S. at 467. Each surplus land Act "employ[ed] its own statutory language, the product of a unique set of tribal negotiation and legislative compromise." *Id.* The foundation of the conclusion in *Mille Lacs* is that a treaty, in the absence of a later Act of Congress, is viewed through the lens of the Indians. 526 U.S. at 196. Indeed, *Shawnee* acknowledged that "courts construe Indian treaties sympathetically to Indian interests to compensate for their unequal bargaining positions in the treaty-making process . . . in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." 423 F.3d at 1220 (citing *Carpenter v. Shaw*, 280 U.S. 363, 366-67 (1930) and quoting *Absentee Shawnee Tribe of Indians in Okla. v. Kansas*, 862 F.2d 1415, 1418 (10th Cir. 1988)). Moreover, *Shawnee* acknowledged the

unreliability of future events because later action may not have been in accord with the terms of a treaty. 423 F.3d at 1223.

One final point needs to be addressed. The State of Michigan argues that a treaty is equivalent to an Act of Congress and is capable of diminishing or disestablishing a reservation within its own text. Dkt. # 152 at 9. This argument is unpersuasive. That is true because "a treaty is not a federal statute or act of Congress." *Keweenaw Bay Indian Cmty. v. Naftaly*, 453 F.3d 514, 530-31 (6th Cir. 2006). That court recognized that a treaty is insufficient to express clear congressional intent. *Id.* It is noteworthy that limiting the inquiry in the context of this case to the text of the two treaties or the parties' intent does not foreclose the possibility that either treaty provided for the diminishment or disestablishment of the Isabella reservation. The point is that a subsequent Act of Congress did not do so and that the relevant inquiry is the interpretation of the treaty itself.

D

In summary, the Court is persuaded that, in the absence of an Act of Congress, the *Mille Lacs* framework applies and modern jurisdictional facts are irrelevant to the analysis of the treaties. Under *Mille Lacs*, the relevant conduct must exhibit a close relationship to the parties' understanding of the treaties. It is clear, for example, that evidence of state, county, or city officials' contemporary conduct is too far removed from the parties' understanding of the treaties to be relevant or admissible. At this stage, it is appropriate to exclude such evidence and the associated expense of discovery.

While it is apparent that the inquiry is limited to the treaties and the parties' understanding as indicated by contemporary history, it is premature at this juncture to completely define the

relevant contemporary history by establishing a time period. The Court has yet to evaluate the treaty or expert opinions that may shape the relevant period of contemporary history. Indeed, at oral argument, counsel for the Saginaw Chippewa speculated that the relevant period mighty extend forty or more years after the second treaty. In addition, it is conceivable that some factual development might be distinguishable from the circumstances and holding in *Mille Lacs*. Thus, the Court is hesitant to define such a period. Certain events post-dating the treaties may require specific consideration by the Court before it may be determined to be irrelevant under *Mille Lacs*.

Notwithstanding that conclusion, the pattern or conduct of the parties to the treaties that commenced contemporaneously with the treaties and carried forward is relevant. Without subsequent congressional action, relevant conduct must flow from the understanding of the treaties. The fact that Congress has not exercised its authority to amend or abrogate the treaties reflects its intent to limit the inquiry to the contemporaneous understanding of the parties. To the extent that Defendants seek to effectuate their present-day understanding of the treaties, their avenue of relief is through the legislative process. *Mille Lacs* restricts from the Court's consideration evidence that does not reliably demonstrate the intent of the parties to the treaties.

IV

Accordingly, it is **ORDERED** that Plaintiff Saginaw Chippewa's motion to strike [Dkt. #151] and Plaintiff United States's motion in limine to exclude *Rosebud Sioux* witnesses [Dkt. # 150] are **GRANTED**.

It is further **ORDERED** that the parties shall amend the witness lists in manner consistent with this Opinion and Order on or before **May 15, 2009**.

                                                s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge

Dated: April 29, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 29, 2009.

                                      s/Tracy A. Jacobs
                                      TRACY A. JACOBS