UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE OF
MICHIGAN,

                    Plaintiff,

-and-

UNITED STATES OF AMERICA,

                    Plaintiff-Intervenor,

                                          Case Number 05-10296-BC

v.                                          Honorable Thomas L. Ludington

JENNIFER GRANHOLM, Governor of the
State of Michigan, MIKE COX, Attorney General
of the State of Michigan, and JAY B. RISING,
Treasurer of the State of Michigan,

                    Defendants,

-and-

CITY OF MT. PLEASANT, and COUNTY OF
ISABELLA,

                    Defendant-Intervenors.

_____/

## ORDER DENYING MOTIONS TO EXCLUDE THE
## TESTIMONY OF EXPERT WITNESSES

       The central question raised in this case is whether 138,330 acres of land in Isabella County,

Michigan, comprising the townships of Wise, Denver, Isabella, Nottawa, Deerfield, and one-half

each of Chippewa and Union, is "Indian country" pursuant to federal law. 18 U.S.C. § 1151. The

Saginaw Chippewa Indian Tribe of Michigan and the United States believe it is. The Michigan

Officials, County of Isabella, and City of Mt. Pleasant believe it is not, or at least that most of it is

not. Resolution of the question will require interpretation of historical documents, specifically two

treaties entered into by the United States and the Swan Creek, Black River, and Saginaw Bands of Chippewa Indians in 1855 and 1864. *See* Treaty with the Chippewa Indians, U.S.-Chippewa, Oct. 18, 1864, 14 Stat. 657 ("1864 Treaty"); Treaty with the Chippewa of Saginaw, Etc., U.S.-Chippewa, Aug. 2, 1855, 11 Stat. 633 ("1855 Treaty").

Federal law defines the term "Indian country" to include land that is "within the limits of any Indian reservation[,] . . . all dependent Indian communities within the borders of the United States[,] . . . [and] all Indian allotments . . . ." 18 U.S.C. § 1151. "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the states." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998) (citing *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998)). Consequently, a determination that the six townships are Indian country would raise additional questions about political sovereignty, including the enforcement of state criminal laws within the six townships and whether the city, county, and state can collect property taxes in the six townships.[1]

Now before the Court are Plaintiff-Intervenor United States' motions to exclude the testimony of the expert witnesses Anthony G. Gulig and Theodore J. Karamanski retained by Defendants Governor Jennifer Granholm, Attorney General Mike Cox, and Treasurer Jay B. Rising ("State Defendants" or "Michigan Defendants") [Dkt. # 188 & 189]; Plaintiff Saginaw Chippewa Indian Tribe of Michigan's motion to exclude the testimony of Gulig and Karamanski [Dkt. # 190]; the Michigan Defendants' motion to exclude the testimony of the Saginaw Chippewa's expert witnesses Gary Anderson and Bruce White [Dkt. # 192]; Defendant-Intervenor Isabella County's

---

[1]The parties agreed by stipulation that the Saginaw Chippewa will not raise issues of state taxation of the six townships in this litigation. [Dkt. # 15]. They agreed that the central question is "[w]hether and to what extent" the six townships are "Indian country." *Id.* ¶ 1.

-2-

motion to exclude the testimony of the Saginaw Chippewa's experts [Dkt. # 197]; and the Michigan

Defendants' motion to exclude the testimony of the United States' experts Frederick Hoxie and R.

David Edmunds [Dkt. # 198].  Because the parties have not demonstrated that any of the proposed

witnesses are unqualified to offer expert testimony about the historic understanding of the treaties,

or that the opinions the experts intend to provide are irrelevant or unreliable, the motions will be

**DENIED**.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993);

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

# I

The Plaintiff in this case, the Saginaw Chippewa Indian Tribe of Michigan, is the successor

in interest of the Swan Creek, Black River, and Saginaw Bands of Chippewa Indians[2] who entered

into treaties with the United States in 1855 and 1864.  Those treaties, however, were not the first

treaties between the United States and the Chippewa Indians living in what is now Michigan.  In

1807, seventeen Chippewas signed the Treaty of Detroit, ceding much of modern-day southeastern

Michigan to the United States.  Treaty with the Ottawa, etc., Nov. 17, 1807, 7 Stat. 105.  In 1819,

a second treaty was negotiated near Saginaw that ceded much of the Chippewas' land in central and

eastern Michigan, including a portion of Isabella County, to the United States.  Treaty with the

Chippewa, U.S.-Chippewa, Sept. 24, 1819, 7 Stat. 203.  In 1836, a third treaty ceded the remainder

---

[2]The general name "Chippewa" is used to refer to a large group of American Indians who historically lived near the great lakes.  The names "Anishinaabeg," "Annishinaabe," "Ojibwe," and "Ojibwa" are often used to refer to the same group, but will not be used in this opinion to promote consistency and limit confusion.  The name "Saginaw Chippewa" refers specifically to the Plaintiff in this case.  Similarly, the parties frequently use the terms "Indian" or "American Indian" to refer more generally to the large group of Americans, of which the Saginaw Chippewa are a part, whose ancestors lived in the United States prior to the arrival of Europeans more than 400 years ago.  The Court will also use the terms "Indian" and "American Indian" to refer generally to the people of this group.

of the northwest Lower Peninsula, including the rest of Isabella County, and a substantial portion of the eastern Upper Peninsula to the United States.  Treaty with the Ottawa, etc., Mar. 28, 1836, 7 Stat. 491.  Finally, in 1837 and 1838, "the Saganaw [sic] tribe of the Chippewa nation" agreed to cede the remainder of their lands in the Lower Peninsula, and "remove from the State of Michigan, as soon as a proper location can be obtained."  Treaty with the Chippewa, pmbl. & art. 6, U.S.-Chippewa, Jan. 14, 1837, 7 Stat. 528; *see also* Treaty with the Chippewa, U.S.-Chippewa, Dec. 20, 1837, 7. Stat. 547; Treaty with the Chippewa, U.S.-Chippewa, Jan. 23, 1838, 7 Stat. 565.

By the time the 1855 Treaty was negotiated in Detroit, the Saginaw, Swan Creek, and Black River Chippewas had largely relinquished the right to live in southern and central Michigan and agreed to move west of the Mississippi River.  Many Chippewas, however, resisted the government's effort to move them westward and continued to live near the Saginaw Bay in central Michigan.  *See* Anderson Rep. at 4–5 & nn.6–9; Karamanski Rep. at 50–52 (discussing the population of Isabella County in the 1850s–1880s).  The Saginaw Chippewa's experts contend that the Chippewas' resistence to removal, together with a limited area to which American Indians could be removed, necessitated a shift in the federal government's approach from removal toward a reservation system.  Consequently, in May of 1855 President Franklin Pierce ordered all the unsold land in Isabella County withdrawn from sale for the purpose of preserving it for future use by the Chippewa Indians.

The parties' experts largely agree that the withdrawal of unsold land in Isabella County was an early example of shifting federal Indian policy during the mid-to-late nineteenth century.  *See Cohen's Handbook of Federal Indian Law* §§ 1.03–.04 (Nell Jessup Newton et al., eds., 2005 & supp. 2009); Robert N. Clinton, et al., *American Indian Law: Native Nations and the Federal System*

-4-

26–36 (5th ed. 2007); Stephen L. Pevar, *The Rights of Indians and Tribes* 7–9 (3d ed. 2002). The new policy would reserve from settlement small parcels of land within states or territories for Indian reservations or allotments. The reserved parcels, according to then-Commissioner of Indian Affairs George W. Manypenny, were necessary "to restrict the limits of all the Indian tribes upon our frontiers, and cause them to be settled in fixed and permanent localities, thereafter not to be disturbed." *Cohen's Handbook of Federal Indian Law* § 1.03[6][a] at 64 (Nell Jessup Newton et al., eds., 2005 & supp. 2009).

Such a policy was also endorsed by the Michigan Legislature in an 1851 Joint Resolution, in which they requested

> the government of the United States to make such arrangements for [the Ottawa and Chippewa] Indians as they may desire, for their permanent location in the northern part of this State, under such provisions in regard to schools, churches, agricultural and mechanical arts, as will the best promote their present and future welfare, and adjust all matters of right and equity that may now be in dispute between said Indians and said government, in a spirit of just liberality.

Joint Resolution Relative to the Ottawa and Chippewa Indians (1851), *in* Acts of the Legislature of the State of Michigan 258 (1851). Despite general agreement concerning the changes in mid-nineteenth century federal Indian policy, there is substantial disagreement among the experts about its application. That is particularly true with respect to the question of whether the land reserved for the Chippewa Indians in Isabella County was meant to be a "reservation," and what that term means.

For example, Gulig and Karamanski, the Michigan Defendants' experts, contend that the lands reserved in Isabella County were never intended to be a "reservation" held in trust for the benefit of the tribe or otherwise subject to federal protection. Quoting Article 6 of the 1855 Treaty, Karamanski contends that the "tribal organization" of the Saginaw, Swan Creek, and Black River

-5-

Chippewa, "except so far as may be necessary for the purpose of carrying into effect the provisions of [the treaty], [was] dissolved" in 1855.  Karamanski Rep. at 4–5.  Karamanski also relies on an 1871 petition allegedly sent by Saginaw Chippewa leaders to Ely S. Parker, then-Commissioner of Indian Affairs.  Indeed, if the petition is genuine, a fact the Saginaw Chippewa's experts contest, it appears to support Karamanski's argument.  It begins:

> We the chiefs and head men of the Chippewas of Saginaw, Swan Creek, and Black River Indians of Michigan who were parties to the treaty of 1855 and that of 1864, believing that the time has now arrived when our condition as wards of the Government should cease, hereby request that steps be at once taken to close those relations as such wards.
>
> By the conditions of the treaty of 1855 our tribe dissolved its tribal relations – and under the provisions of the constitution of the State of Michigan we are citizens of the State, capable of voting and holding office – and do vote at the State, County, town and school elections and hold Offices under the laws of the State.

Chiefs of Isabella Reservation to COIA Parker (May 8, 1871).

The Saginaw Chippewa's experts interpret Article 6 of the 1855 Treaty differently.  Expert Gary Anderson argues that the "tribal organization" that was dissolved by the treaty was not the relationship between individual American Indians and a sovereign tribal band, but the association of the three bands that were parties to the treaty—the Saginaw, Swan Creek, and Black River Bands—with one another.  Anderson Rep. at 13–17.  Anderson emphasizes that contemporaneous references to the six townships often denominated the land a "reservation" and that the annual report to congress submitted by Commissioner of Indian Affairs George W. Manypenny in 1855 referred to it as a place where "permanent homes" could be "confirmed" for the Saginaw Chippewas.  *See* Annual Report of the Commissioner of Indian Affairs (1855).

Anderson also quotes the treaty journal—similar to a legislative history for a treaty—of the Treaty with the Ottawa and Chippewa, which was signed in Detroit two days before the 1855

-6-

Saginaw Chippewa Treaty. *See* Treaty with the Ottawa and Chippewa, July 31, 1855, 11 Stat. 621. No treaty journal exists for the 1855 Saginaw Chippewa Treaty, but the treaty journal for the Ottawa and Chippewa Treaty may still be informative. Article 5 of the Ottawa and Chippewa Treaty is similar to Article 6 of the Saginaw Chippewa Treaty in that it calls for the "tribal organization" of the Ottawa and Chippewa to be "dissolved." In the treaty journal, Commissioner of Indian Affairs Manypenny is quoted as explaining to a Chippewa chief from the Upper Peninsula named Waw-be-geeg that Article 5 will separate the Ottawa and the Chippewa from one another so that they do not have to negotiate future treaties together. Thus, Anderson suggests, the Saginaw Chippewas who negotiated the 1855 Treaty would have understood Article 6 to separate the Saginaw, Swan Creek, and Black River Bands from one another, not the individual members from the tribe. Anderson Rep. at 14–16.

Despite the disagreement among the experts about whether the 1855 Treaty created a reservation or dissolved the relationship between individual Indians and the tribe, there is substantial agreement that the federal government largely mishandled, or ignored, its part of the bargain. Pursuant to the 1855 Treaty, the six townships were to be selected from the land previously withdrawn from sale by President Pierce, and distributed to the members of Saginaw, Swan Creek, and Black River Bands of Chippewa. The Chippewas were also entitled, pursuant to the treaty, to make selections from two additional townships located near the Saginaw Bay of Lake Huron, if they preferred. Article 1 of the Treaty provides:

> The United States will give to each of the said Indians, being a head of a family, eighty acres of land; and to each single person over twenty-one years of age, forty acres of land; and to each family of orphan children under twenty-one years of age, containing two or more persons, eighty acres of land; and to each single orphan child under twenty-one years of age, forty acres of land; to be selected and located within the several tracts of land hereinbefore described, under the same rules and

regulations, in every respect, as are provided by the agreement concluded on the 31st day of July, A.D. 1855, with the Ottawas and Chippewas of Michigan, for the selection of their lands.

And the said Chippewas of Saginaw and of Swan Creek and Black River, shall have the same exclusive right to enter lands within the tracts withdrawn from sale for them for five years after the time limited for selecting the lands to which they are individually entitled, and the same right to sell and dispose of land entered by them, under the provisions of the Act of Congress known as the Graduation Act, as is extended to the Ottawas and Chippewas by the terms of said agreement.

And the provisions therein contained relative to the purchase and sale of land for school-houses, churches, and educational purposes, shall also apply to this agreement.

1855 Treaty, Art. 1, 11 Stat. 633.

Pursuant to the treaty, individual members of the Saginaw, Swan Creek, and Black River Bands were entitled to make selections of forty-or eighty-acre parcels from within the six-township area or the two-township Saginaw Bay area. After the selections were made, the individuals were to be issued a certificate, which entitled each individual to possession of a parcel of land. The objective was that the Chippewas would build homes and clear plots for agricultural purposes on their own allotments of land. Eventually, the local Indian agent was to send a list of the selections to Washington, where the Land Office would ensure that the certificates were issued for land with clear title, and issue patents to the individual tribal members.

The process, however, did not go as planned. In the 1850s, Isabella County remained a heavily forested wilderness, with relatively few inhabitants—part of the reason it had been selected by federal officials. Gulig Rep. at 54. According to one account, the first settler of European descent did not arrive in Isabella County until 1854, settling in Union Township just south of what is now Mt. Pleasant. *Id.* at 63. The non-Indian people who worked and traveled in Isabella County at that time were interested, nearly exclusively, in the development of the lumber industry.

According to United States' expert Frederick E. Hoxie, 160 billion board-feet of lumber, enough to build ten million six-room homes, was cut from Michigan's forest between 1837 and 1897. Hoxie Rep. at 48. The most valuable forests were in the central part of the Lower Peninsula of Michigan, where Isabella County is located. *Id.* By 1853 there were twenty-three sawmills operating on the Saginaw River, with twenty-one more under construction. *Id.* "Timber cruisers" roamed the area looking for standing timber to feed the mills, and buying up thousands of acres of land for as little as $1.00 per acre.

The rampant land speculation fueled by the immensely profitable lumber industry, coupled with inaction from federal officials, created immediate problems for allotting land to the Saginaw Chippewas in Isabella County. Some members of the Saginaw, Swan Creek, and Black River Bands moved to the reserved area and selected allotments shortly after the treaty was signed, and in 1857, a list of selections was forwarded to the Commissioner of Indian Affairs. But the General Land Office in Washington was not notified of individual selections until 1859. *Id.* at 61. Moreover, certificates had still not been issued when new Indian Agent L.C. Leach took responsibility for implementing the 1855 Treaty in 1861, and patents for the land had still not been issued in 1863 when discussions of a new treaty begin to appear in the historical record. According to the State Defendants' expert Anthony Gulig, by July of 1863 the lack of title documents was "causing an ever-growing distrust of the federal government." Gulig Rep. at 64. According to Gulig, that led the representatives of the Bands living in Isabella County to send a petition to the commissioner of Indian affairs seeking issuance of land certificates. *See also* Anderson Rep. at 20. Even after Leach forwarded a list of 497 selections from the Isabella reserve and 109 selections from the Saginaw Bay reserve to the Land Office in 1861 and 1862, certificates were never issued pursuant to the terms of

-9-

the treaty. *Id.*

In addition to the problems with the allotment process, several concerns about the quality and quantity of the land set aside in Isabella County and on the Saginaw Bay also motivated the parties to consider a new treaty in 1864. First, as much as 40,000 acres of land in the six townships and the Saginaw Bay reserve had been sold or set aside before the 1855 reservation, and thus was unavailable for allotment to the Chippewas. Nearly 7,000 acres had been sold. An additional 14,000 acres in the Isabella townships and much of the land on the Bay was "swampland" subject to claims by the State of Michigan under the Swamplands Act of 1850. Portions of the remaining land were reserved for schools or canals and thus unavailable for allotment. *Id.* at 23–27. Second, the fact that much of the land on the Bay was swampland, according to some experts, also made it less suitable for agriculture and less desirable for the Indians living there. In 1864, Leach informed officials in Washington that the Saginaw, Swan Creek, and Black River Chippewas were ready to negotiate a new treaty, relinquish the land on the Bay, and consolidate in Isabella County. Hoxie Rep. at 62–63.

The Saginaw Chippewa's experts advance additional reasons for negotiations of a new treaty in 1864. According to the Tribe's experts, it was not just the Chippewas' concern about the lack of patents and the high concentration of swampland in the Saginaw Bay parcel that led to renegotiation of the 1855 Treaty. The Saginaw Chippewas wanted to secure enough land that their children would be able to own their own parcels within the six townships. Moreover, it was not just the Chippewas that wanted the patents. Lumber speculators wanted them issued too, which would enable them purchase the standing timber, or the land on which it stood, from the Chippewas. It is also "possible" that the railroads wanted the land on the Bay removed from the allotment process to

-10-

ensure a clear path for the railroad from Clare, a developing town about fifteen miles north of the reserve lands in Isabella County.  Anderson Rep. at 28–29.

Whatever the reason for the renegotiation, the Saginaw, Swan Creek, and Black River Bands of Chippewa met with federal officials, including Leach, George Bradley, and Indian Agent H.J. Alvord, on October 15, 1864 at the "Isabella Indian Reservation" in Michigan to negotiate a new treaty.  1864 Treaty, pmbl., 14 Stat. 657.  Representing the Chippewa were twenty-eight chiefs and headmen.  Although it is difficult to be certain about who the Chippewa negotiators were—their names are written phonetically in English—it is likely that several of the chiefs and headmen were also signatories to the 1855 Treaty, including "Jno. Pay-me-quo-ung," "Nauck-che-gaw-me," "Andw. O-saw-waw-bun," "Naw-taw-way," "Naw-we-ke-zhick," and "L. Pay-baw-maw-she." *Compare* 1864 Treaty, 14 Stat. 657, *with* 1855 Treaty, 11 Stat. 633.  Charles H. Rodd, a man of half-Indian descent living in Isabella County, served as a translator on behalf of the government.  Rodd had also served as a translator for the 1855 Treaty, and later participated in a controversial deal with Saginaw businessman Ezra Rust to purchase a 15,000-acre tract within the boundaries of the reserved land.  Edmunds Rep. at 14.

Pursuant to the terms of the treaty, the Saginaw, Swan Creek, and Black River Chippewas relinquished their right to the land on the Bay, but ensured that all the remaining unsold land in the six Isabella townships would be allotted to the Chippewas.  Under the 1855 Treaty, land that was not allotted within a set time period was to be offered for sale to the general public.  Under the new treaty, all unsold land was reserved for the Saginaw Chippewas.  Land not selected by the tribal members who were eligible at the time the treaty was negotiated in 1864 would be held for allotment to younger tribal members when they reached the age of 21.  The new treaty also contained a

-11-

provision designed to protect the lands after allotment, providing that two types of patents should be issued. If the individual who received the patent was deemed "competent," the patent would be granted in fee simple with no restraints on alienation; if the individual was deemed "not so competent," the patent would be marked and the land could not be sold by the individual.

Still, despite the apparent improvements, implementation of the new treaty proved no more successful than implementation of the first treaty. The 1864 Treaty did not provide an objective method for denominating individuals to whom patents were issued as "competent" or "not so competent." Consequently, the process varied widely depending upon who the Michigan agent was at the time. In the summer of 1869, fourteen years after the original treaty was signed, new Indian Agent James Long arrived in Isabella County to validate the selections made by the Saginaw Chippewas and begin the process of issuing patents. Anderson Rep. at 35. Long found most of the Indians competent, despite the fact that there was little evidence that the majority of the Band members could read or understand English, or that they understood the significance of the certificates they had been issued under the 1864 Treaty. Karamanski Rep. at 23.

Saginaw Chippewa expert Anderson described the situation in Isabella County at the time in his report. "On assuming the job, Agent Long found a growing, aggressive group of land speculators and lumbermen entrenched at Mount Pleasant, Saginaw, and Detroit. Trespassing was occurring on Indian lands almost daily, as lumberman, often with questionable sales contracts, cut Indian timber." Anderson Rep. at 35. After the selections were made by the individual Indians and the certificates were issued, timber agents rapidly acquired them by purchase or swindle. Even though the certificates entitled the Indians to possess and improve the land, it is not clear whether the treaty negotiators intended for the land to be alienable after issuance of the certificates but before

-12-

receiving patents from the General Land Office. Written documentation of whether the individual was "competent," and thus whether the land could be sold without permission of the Commissioner of Indian Affairs, did not take place until the patent was issued.

In any event, a federal judge in the Western District of Michigan informed Agent Long by letter that land certificates entitled the Saginaw, Swan Creek, and Black River Chippewas to sell their allotments. Anderson Rep. at 36. Sales happened quickly over the next decade, many before the first patents arrived in 1871. Allegations of fraud—many involving prominent Saginaw businessmen like Rust and Arthur Hill—clouded many of the transactions. According to one account, a young Arthur Hill "borrowed" an Indian agent's luggage from a train station in Clare, staying up all night to copy the names of the Chippewa to whom patents were to be issued. The goal was apparently to find the individuals and buy their allotments before sales were prohibited by issuance of patents or other lumber speculators found the individuals and purchased the land. *Id.* at 48–50. By the time the Indian Reorganization Act passed in 1934, only 120 of the nearly 100,000 unsold acres reserved from sale pursuant to the treaties were still owned in fee simple by Chippewa Indians. Karamanski Rep. at 65. An additional 1,666 acres were held pursuant to restricted patents, but the ownership structure of this land was so divided that it held little practical value. Edmunds Rep. at 47.

The Indian Reorganization Act of 1934, 25 U.S.C. § 461 et seq., was intended to return a greater measure of sovereignty to the Indian tribes living within the United States, and stop the loss of Indian-owned land through sale by individuals and tribes. *Cohen's Handbook of Federal Indian Law* § 1.05 at 84 (Nell Jessup Newton et al., eds., 2005 & supp. 2009). The successor to the Saginaw, Swan Creek, and Black River Bands of Chippewa—Plaintiff Saginaw Chippewa Indian

Tribe of Michigan—was formed pursuant to the Indian Reorganization Act in 1937. The statute's provisions regarding tribal sovereignty, however, proved to be largely unsuccessful, and the provisions regarding preservation of Indian-owned land, although "remarkably successful," came too late to preserve Chippewa ownership of the land in the six townships. *Id.* Although the Indian Reorganization Act allowed the Saginaw Chippewa to reacquire some of the land they lost in the aftermath of the 1855 and 1864 Treaties, they only regained control of one or two thousand acres of land in the six townships. Edmunds Rep. 48, 53.

## II

The parties have retained a skilled group of scholars to assist in understanding the treaties and the context from which they arose. The State Defendants have retained two experts, Drs. Anthony Gulig and Theodore Karamanski, to support their position. Gulig is an associate professor of history at the University of Wisconsin-Whitewater, where he teaches multiple courses, including American West, American Indian History, Introduction to American Indian Studies, American Indian Law and Policy, United States Experience in a World Context, and North American Environmental History. Gulig CV; [Dkt. # 188-3]. Gulig earned a Ph.D. in 1997 from the University of Saskatchewan, where he studied Canadian history with an "emphasis on Canadian and American Indian-white relations and Indian policy[.]" *Id.* His dissertation discussed relations between the government and Indians living in northern Saskatchewan and Wisconsin between 1900 and 1940. Gulig also holds two degrees in history from the University of Wisconsin-Eau Claire.

Gulig has published scholarship on Indian history and Indian law in dozens of journals, including *Native Studies Review*, *The American Indian Quarterly*, and *Tulsa Law Review*. He has also served as an expert witness for the defense in a Canadian Provincial Court case, and an expert

-14-

witness for the State of Michigan in *Keweenaw Bay Indian Community v. Naftaly*, 370 F. Supp. 2d

620 (W.D. Mich. 2005) *aff'd by* 452 F.3d 514 (6th Cir. 2006).

 Karamanski is a professor of history at Loyola University of Chicago, where he has taught

courses including United States History 1865, History of the Frontier in the United States, History

of Canada, Public History Method and Theory, and American Indian History.  Karamanski CV;

[Dkt. # 189-1].  Karamanski also completed his education at Loyola, earning a Ph.D. in history from

the university in 1979 and an undergraduate degree in 1975.  Karamanski has published several

books and dozens of papers on a wide range of historical topics.  Unlike the majority of the retained

experts involved in the case, however, his focus, at least until quite recently, has not been on Indian

history or the particular experiences of American Indians.

 The United States has also retained two experts, Drs. Frederick E. Hoxie and R. David

Edmunds.  Hoxie is the Swanlund Professor of History at the University of Illinois in Urbana, where

he teaches multiple courses, including Native American History, American Indian Law, History of

the United States to 1877, Problems in Native American History, Research Seminar in Native

American History, The Indians of Illinois, and Natives and Newcomers in the Pacific.  Hoxie CV;

[Dkt. # 207-3].  Hoxie earned a Ph.D. in 1977 and an M.A. in 1976 from Brandeis University, where

he concentrated his studies on the history of American civilization.  His Ph.D. thesis was entitled

"Beyond Savagery: The Campaign to Assimilate the Indians, 1880-1920."

 Hoxie has published dozens of articles and books on topics related to Indian history in

America.  He has served as an expert witness or consultant in numerous cases in federal court;

usually, but not always, appearing on behalf of the United States or a federal agency.  *See, e.g.*,

*Solem v. Bartlett*, 465 U.S. 463 (1984); *United States v. Blaine County*, 363 F.3d 897 (9th Cir.

2004); *United States v. Dupris*, 612 F.2d 319 (8th Cir. 1979); *United States v. A Juvenile*, 453 F. Supp. 1171 (D.S.D. 1978).

Edmunds is the Watson Professor of American History at the University of Texas at Dallas, where he teaches courses in American History and Native American History. Edmunds CV; [Dkt. # 207-4]. Edmunds received his B.A. from Millikin University in Decatur, Illinois, his M.A. from Illinois State University, and a Ph.D. in American History from the University of Oklahoma. He has published numerous articles and books on the topic of "Native American people in the Great Lakes and Midwest," including one that was nominated for the Pulitzer Prize in Biography. *Id.* He has previously prepared historical reports to support litigation involving issues of American Indian law. *See, e.g.*, *Seneca-Cayuga Tribe of Okla. v. Town of Aurelius*, 233 F.R.D. 278 (N.D.N.Y. 2006).

The Saginaw Chippewa retained three experts in conjunction with this litigation, Drs. Gary Clayton Anderson, Bruce M. White, and J. Randolph Valentine[3]. Anderson is a Professor of History at the University of Oklahoma, where he teaches courses in United States History and American Indian History. Anderson CV; [Dkt. # 190-A at 86]. Anderson earned his B.A. from Concordia College in Moorhead, Minnesota, an M.A. from the University of South Dakota, and a Ph.D. from the University of Toledo in 1978. Anderson has published numerous articles and books on American Indian History, including one, *Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875*, that was nominated for the Pulitzer Prize in History. Anderson has previously served as an expert witness in litigation related to Indian history, including service as an expert witness for the State of Michigan in 2005.

---

[3]Valentine is a linguistics expert whose report and proposed testimony have not been challenged. Consequently, it is unnecessary to consider his qualifications to offer expert testimony at this time.

White is the only retained expert involved in this case who is not a professor. Rather, he is a "[f]ree-lance consultant, anthropologist, and historian" for Turnstone Historical Research of St. Paul, Minnesota. He has an extensive educational and professional background in American Indian history. White CV; [Dkt. 189-B at 102]. White earned a B.A. from the University of Minnesota in 1978, an M.A. from McGill University, Montreal, in 1985, and a Ph.D. in anthropology from the University of Minnesota in 1994. His Ph.D. dissertation was entitled "Familiar Faces: The Photographic Record of the Minnesota Anishinaabeg." *Id.* Although not a professor, White has published numerous articles and manuscripts on American Indian history, focusing primarily, but not exclusively, on Indians from Minnesota and Canada. He has also served extensively as an expert witness and researcher on litigation related to Indian history, serving both Tribes and government-based parties. *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999).

## III

The standard for the admissibility of expert testimony is set forth in Federal Rule of Evidence 702. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the U.S. Supreme Court explained that trial judges "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. The Court enumerated four nonexclusive

factors for lower courts to employ in evaluating the admissibility of scientific evidence.  Those factors include (1) whether the expert's "theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the theory or technique's "known or potential rate of error"; and (4) the "general acceptance" of the theory or technique by the "relevant scientific community." *Id.* at 593–94.  Although *Daubert*'s analysis was specifically limited to "scientific" experts, *id.* at 589–90 n.8, the Court held in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), that the enumerated test was applicable to other types of "technical" and "specialized" knowledge as well.  *Id.* at 147.

Determination of the initial qualifications of an expert to provide testimony is within the discretion of the district court.  *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 849 (6th Cir. 1981).  "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determinations."  *Kumho Tire*, 526 U.S. at 142 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

The *Daubert* factors are not particularly helpful in this case.  *See First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (citing *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir. 1997)).  There is no way to "test" whether the experts' testimony concerning the historical understanding of the treaties is correct.  Nor is it possible to establish an "error rate" for historical experts.  Although publication, peer review, and general acceptance may be of some relevance to historical testimony, the parties briefs do not demonstrate that they are particularly helpful in this instance.  Past publications on Indian history may indicate a particular expert is qualified to testify about Indian perception and understanding of events, but published research on the Saginaw, Swan Creek, and Black River Bands' understanding of the 1855 and 1864 treaties apparently does not

exist.  Moreover, even the most cursory review of the submitted reports reveals there is no generally accepted conclusion concerning the Chippewas' understanding of the treaties.

The limited applicability of the *Daubert* factors, however, does not relieve the Court of the duty to perform its gatekeeping function.  *First Tenn. Bank*, 268 F.3d at 335.  Other previously employed factors may be relevant, including whether the proposed expert's research and specialized knowledge was conducted for the purpose of the litigation or an independent purpose; whether the proposed expert has improperly extrapolated an unfounded conclusion from a generally accepted premise; whether the proposed expert has considered alternative explanations and conclusions; and whether the proposed expert has conducted the litigation analysis with the same level of "intellectual rigor" used outside the courtroom.  Advisory Notes on 2000 Amendments, Fed. R. Evid. 702.  No matter which factors are used, the key question remains the same: Does the expert possess "specialized knowledge" that will aid the trier of fact in determining a fact in issue, and is the proposed testimony the product of sufficient research that was conducted pursuant to reliable methods?

### A

The Saginaw Chippewa filed a single motion challenging both the State Defendants' experts. [Dkt. # 190].  The Tribe first challenges Karamanski's qualifications to provide opinion testimony concerning the treaties of 1855 and 1864.  Fed. R. Evid. 702 (providing a witness must qualify as an expert based on "knowledge, skill, experience, training, or education").  The Saginaw Chippewa do not question Karamanski's academic credentials as a historian, but instead focus on his particular area of expertise, which they contend is outside the realm of Indian history.  In particular, the Saginaw Chippewa contend Karamanski "has not had meaningful research, publications, experience,

or scholarship" in Indian history; his degrees are from a school, Loyola University of Chicago, that does not focus on Indian history; and his teaching career, also at Loyola, has focused on "public" and "frontier" history in the United States and Canada, rather than Indian history.  Saginaw Chippewa Mot. at 6–12; [Dkt. # 190].

The State Defendants respond, citing an affidavit provided by Karamanski, by noting he studied Indian American history as an undergraduate and graduate student; taught courses focused on Indian history, and other courses that covered topics in Indian history; and, perhaps most importantly, he has conducted extensive research in the subject, particularly in the last ten years. *See* Aff. of Karamanski ¶¶ 4–7 & 12–14; [Dkt. # 209-1].  His research has resulted, inter alia, in a 1983 book on fur trade in remote parts of North America, focusing particularly on exploration by European traders and, to a lesser extent, their interactions with American Indians; an expert report prepared for the State of Michigan in a lawsuit captioned *United States v. Michigan*; and a book-length manuscript on Andrew J. Blackbird, a prominent Ottawa Indian from Michigan in the mid-to-late nineteenth century.  *Id.* ¶¶ 8–9.

Karamanski is qualified to provide expert opinions concerning the historical interpretation of the 1855 and 1864 treaties.  His qualifications to perform historical research are notable, as the Saginaw Chippewa acknowledge.  To the extent he has, at times, focused on "public" and "frontier" history, rather than American Indian history, the potential biases created by his particular focus should be the subject of cross examination, not exclusion under *Daubert*.  Permitting Karamanski to testify in this case is not akin to permitting a "divorce lawyer . . . to opine on patent law."  *See Berry v. Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994).  The quotation is notorious, but it is of limited application to this case.  Karamanski's analysis, like the analysis of the other experts involved in the

-20-

case, was the product of extensive primary source research conducted specifically in preparation for this case. It is not beyond belief that a skilled divorce lawyer, provided with the necessary time and the budget, could submit a well reasoned, well researched brief addressing a question of patent law. Similarly, although Karamanski has focused his research, writing, and teaching more broadly on the American frontier, he has provided a well reasoned and well researched report on the experience of the Chippewa Indians living in mid-Michigan during the mid-to-late nineteenth century. Moreover, his recent work on the experience of American Indians in Michigan provides adequate context for the specific research required in this case. Karamanski's "knowledge, skill, experience, [and] education" qualify him to provide testimony on the historical understanding of the 1855 and 1864 treaties.

The Saginaw Chippewa next contend that the testimony of Karamanski and Gulig should be excluded because it is not reliable. Fed. R. Evid. 702 (noting expert testimony must be "the product of reliable principles and methods"); *see also Daubert*, 509 U.S. at 589 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). The Saginaw Chippewa contend the Karamanski and Gulig have not cited a sufficient number of primary sources or utilized the correct resource collections; in short, that they have not conducted sufficient research to ensure the reliability of their opinions. Saginaw Chippewa Mot. at 12–19.

The Saginaw Chippewa will have an opportunity at trial to impeach Karamanski and Gulig with contrary evidence the experts did not address, but, as the State Defendants correctly note, the number of sources cited by an expert may not be a strong predictor of the reliability of that expert's research. Nor have the Saginaw Chippewa pointed to a specific primary source available at the research centers suggested by the Saginaw Chippewa, including their own Ziibiwing Center, that

-21-

was not available at the research centers used by Karamanski and Gulig.  Ultimately, while the State

Defendants' experts may have spent less time reviewing primary sources than the Saginaw

Chippewa would have liked, they have, for the most part, accurately cited the primary sources they

have relied upon and provided those sources to the Court.  Some of their opinions may be impeached

by reference to additional sources not cited in their reports, but their reports and testimony will not

be excluded from evidence because they did not cite every relevant document.

The remaining twenty-seven pages of the Saginaw Chippewa *Daubert* motion is devoted to

the Tribe's third argument, contending that the reports and proposed testimony of the State

Defendants' experts are not reliable because they are based on a flawed methodology.  Fed. R. Evid.

702 (noting expert testimony must be "the product of reliable principles and methods . . . applied

. . . reliably to the facts of the case").  The Saginaw Chippewa first contend that the State

Defendants' methodology is flawed because they began their research with a predetermined

conclusion, and then ignored evidence that did not corroborate that particular view of the facts.

Saginaw Chippewa Mot. at 22–36.

In support of their assertion that Karamanski reached a conclusion before he started his

research, the Saginaw Chippewa emphasize that his stated reason for not collecting documents from

the Ziibiwing Center was that he "didn't think it would be right to use that information in a case that

was contrary to the Saginaw Chippewa."  *Id.* at 23.  According to the Saginaw Chippewa, the

statement demonstrates that Karamanski had decided to write a report "contrary to" the Plaintiffs'

position before he began his research.  The State Defendants' respond that Karamanski is an expert

on the "ethics" of providing expert historical testimony, publishing a book on professional ethics

for historians in 1990, and that he understands historians who provide expert testimony should not

-22-

act as advocates.  Karamanski Aff. ¶ 5.

Karamanski's statement that he did not collect documents for the Ziibiwing Center because he did not want to use the Tribe's own data against it is some evidence that he was sensitive to the fact that he was being compensated to conduct research by an entity interested in a particular conclusion.  He was aware of the perceived bias that arises out of the fact that he was retained to support the State Defendants' efforts to defend the case.  Karamanski knew that the State Defendants' intended to argue that the 1855 and 1864 treaties did not establish a reservation in Isabella County, providing the Saginaw Chippewa with sovereign control over the land in question. He was aware that, if his historical research led to a similar conclusion about tribal sovereignty, the State Defendants would use his research to support their position.  But his statement concerning the Ziibiwing Center is not strong evidence that he began his research with a predetermined conclusion or that he intentionally ignored evidence that was contrary to that allegedly predetermined view. In short, it is an insufficient reason to doubt his own sworn statement that he "evaluated the evidence in this case in accordance with the best practices of the historical profession, unbiased by personal, political, or pecuniary influence."  Karamanski Aff. ¶ 5.  Karamanski's testimony will not be excluded on the grounds that it was "predetermined."

It is worth noting that all of the historical experts involved in this case are aware of the position of the party funding their research.  Indeed, the "pressure" faced by historical experts when called on to prepare a report or offer testimony in support of litigation are immense.  *See* Daniel A Farber, *Adjudication of Things Past: Reflections on History as Evidence*, 49 Hastings L.J. 1009, 1011–12 (1998).  Use of historical experts in litigation requires scholars who are trained to seek answers through objective analysis into an arena where the answers come from comparing

-23-

arguments made by opposing sides.  *See* Maxine D. Goodman, *Slipping Through the Gate: Trusting* Daubert *and Trial Procedures to Reveal the 'Pseudo-Historian' Expert Witness and to Enable the Reliable Historian Expert Witness—Troubling Lessons from Holocaust-Related Trials*, 60 Baylor L. Rev. 824 (2008); Matthew J. Festa, *Applying a Usable Past: The Use of History in Law*, 38 Seton Hall L. Rev. 479 (2008); Jonathan D. Martin, Note, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U.L. Rev. 1518 (2003).  Nevertheless, the historical evidence provided is necessary to the resolution of this case, and the presence of bias and advocacy in an otherwise objective discipline will require careful analysis of the evidence provided by the experts, not exclusion.

Similarly, the Saginaw Chippewa argue that Gulig's testimony should be excluded as predetermined.  They contend that his major premise—that the Chippewas were eager to relinquish their tribal organization and sovereignty in order to become full citizens of the state of Michigan—has previously been called into doubt by a Western District of Michigan court and the Sixth Circuit.  *See Keweenaw Bay Indian Cmty. v. Naftaly* (*Naftaly I*), 370 F. Supp. 2d 620 (W.D. Mich. 2005); *aff'd by Naftaly II*, 452 F.3d 514 (6th Cir. 2006).

Putting aside the fact that the *Naftaly* courts were dealing with a different Band of Chippewa Indians and a different treaty, the specific testimony those courts questioned was his "conclusory assertion" that " 'Indians wanted to participate as citizens of the state, and taxation was an important part of that citizen participation.' " *Naftaly II*, 452 F.3d 514, 526.  The issue raised in *Naftaly* was whether the state could impose and collect property taxes on Indian-owned land within a recognized reservation.  The Sixth Circuit questioned Gulig's conclusory assertion that the Indians' desire for state citizenship led to their recognition and acceptance of taxation, not his research into the Indians'

-24-

underlying reasons for negotiating the treaty.

Taxation, by reason of the parties' stipulation, is not an issue in this case. More importantly, there is evidence that the Saginaw, Swan Creek, and Black River Bands wanted to participate as citizens of the State of Michigan. Whether, as a result of their desire for state citizenship, they intended to abandon their tribal organization is another issue altogether. The *Naftaly* courts were not prepared to conclude, based on the fact that the Lake Superior Band of Chippewa wanted to become citizens of Michigan, that they also wanted and intended to be taxed. It is not yet time to consider whether or to what extent the Saginaw, Swan Creek, and Black River Bands' desire to become citizens of Michigan included a willingness or intention to give up their individual association with a particular band and abandon their tradition of communal living. However, the question itself is not so far fetched that Gulig's report and testimony should be excluded from trial. *See* Saginaw Chippewa Mot. at 30.

The Saginaw Chippewa also dispute specific facts contained in the Gulig and Karamanski reports, and contend that the factual errors demonstrate the expert reports are the product of unreliable methods. Fed. R. Evid. 702. Gulig, as the State Defendants' admit, incorrectly attributed a 1904 comment from a biography of Conrad Weiser to Weiser himself. *Id.* at 28. Karamanski made the hyperbolic suggestion that "old" or "former" Isabella Reservation was the "most common way" primary source documents from the "first three decades of the twentieth century" referred to the six townships. He cited only five sources to support his statement, while the Saginaw Chippewa were able to produce thirty-one sources at his deposition to contradict him. *Id.* 32. Such "extrapolation" of a generalization from insufficient data may be a "red flag" that the expert's testimony is unreliable, *Best*, 563 F.3d at 177, but it does not, without more, require exclusion of that

-25-

expert and his testimony altogether.

The Court is cognizant of the important function it plays, pursuant to Rule 702, as the gatekeeper charged with admitting or excluding expert testimony based on a determination of whether the proffered testimony is both relevant and reliable.  However, the fact that some experts retained by the parties may appear more reliable—based on their education, experience, research depth, and research methods—does not necessarily mean that the less reliable experts must be excluded.  The question to be addressed at this stage is a threshold issue concerning which facts and opinions should even be considered by the finder of fact.  Too often, the Saginaw Chippewa argue the merits of the case rather than the admissibility of the evidence.  State Defs. Mot. at 21.  While it is true that some facts are necessary to accurately evaluate the reliability of the reports, questions about the meaning of Article Six of the 1855 Treaty and the relevance of the May 1871 Petition are premature.

## B

The United States filed two motions, one to strike the testimony of Gulig [Dkt. # 188] and one to strike the testimony of Karamanski [Dkt. # 189].  Similar to the Saginaw Chippewa, the United States contends that Karamanski's testimony should be excluded because he does not have the required "specialized knowledge" in Indian history.  U.S. Mot. at 6–10.  The argument was discussed above and need not be revisited at length.  Karamanski has less experience in Indian history than the other retained historical experts involved in this case, and that fact will likely be relevant when evaluating the relative weight to be afforded his assumptions and opinions.  However, his experience in Indian history, as opposed to general history, does not affect the quality of his research methods or the primary sources he cites.

Moreover, one of the United States' methods [Dkt. # 215] of impeaching Karamanski's qualifications in this case—submitting declarations of its own experts questioning his standing in the field—is only marginally relevant and largely unhelpful.[4]   The declarations of Hoxie and Edmunds make clear that other Indian history experts do not consider Karamanski an expert in their field.  Indeed, according to Edmunds, Karamanski's "name was never mentioned" in a discussion about scholars from whom to solicit essays on "Great Lakes Indians."  Edmunds Decl. ¶ 8.  While that may be reflective of whether Karamanski's scholarship is generally accepted and approved of by other American Indian scholars, it provides little insight into the principal considerations of whether Karamanski's report is relevant and reliable in this case.  The conventional wisdom concerning Indian understanding of treaties, as developed by a small and select group of scholars who consider one another experts in the field is not the primary concern in this case.  The issue is how the Saginaw, Swan Creek, and Black River Bands of Chippewa Indians understood the treaties they entered into with the United States in 1855 and 1864.  Karamanski's report provides relevant and reliable information concerning that question.  It will not be excluded.

The United States' objection to Professor Gulig's report focuses primarily on its relevance to the litigation.  The United States contends that Gulig's report misconstrues property ownership in fee simple as a result of the allotment process as inconsistent with the creation of a reservation.  According to the United States, Gulig's contention is that there cannot be a reservation if the land was allotted to individuals in fee simple, because reservations, by definition, consist of land held in trust by the federal government for the collective benefit of a tribe.  The United States further

---

[4]The State Defendants employ a similar tactic in their motions to exclude experts retained by the Saginaw Chippewa and the United States.

contends that the definition of the word "reservation" encompasses much more than that.  Indeed,

Gulig apparently admitted as much in his deposition.  United States Mot. at 8–10.  The crux of the

problem is the meaning of the word "reservation."[5]

> According to one popular source, the meaning of the word has evolved over time.
>
> The term "Indian reservation" originally meant any land reserved from an Indian cession to the federal government regardless of the form of the tenure.  During the 1850s, the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence or use of tribal Indians, regardless of origin.  In the 1850s , the federal government began frequently to reserve public lands from entry for Indian use.  This use of the term "reservation" from public land law soon merged with the treaty use of the word to form a single definition describing federally protected Indian tribal lands without depending on any particular source.  This definition of the term "reservation" has since been generally used and accepted.

*Cohen's Handbook of Federal Indian Law* § 3.04[2][c][ii] (Nell Jessup Newton, et al. eds., 2005 &

supp. 2009).

The term "reservation" has been—and continues to be—used in different ways in different

contexts.  Whether the treaties of 1855 and 1864 "created a land base held in trust or common" may

be irrelevant, as the United States contends, if indeed the use of the term "reservation" in § 1151

encompasses more than just land "held in trust or common."  That issue is not before the Court at

this time.  What is before the Court is whether the information provided in Gulig's report is relevant.

His opinions concerning whether the Saginaw, Swan Creek, and Black River Bands believed the

treaties created a "land base to be held in trust for" their benefit is relevant.  Gulig Rep. at 4.  The

meaning of the term "reservation" as it is used in § 1151, will also be addressed before this case is

---

[5]The discussion of the term "reservation" contained within this section is solely for the purpose of evaluating the relevance and reliability of the Gulig report.  It is not meant to express the Court's view on the meaning of the term as it is used in the federal statute defining "Indian Country."  18 U.S.C. § 1151.

resolved, but the argument is presently premature.  U.S. Mot. at 9.

If the United States' contention regarding the law is correct, Gulig's report may prove of little use to the finder of fact in determining the ultimate issue in this case, nevertheless, the report will assist the Court in understanding the Chippewa's intentions regarding the treaties.  As such, it is relevant.  Gulig, like many of the other experts, could have used the word "reservation" more precisely.  However, that fact alone is not a ground for excluding his report from evidence.

### C

The State Defendants filed a single motion to strike the testimony of both the Saginaw Chippewa's experts, White and Anderson.  [Dkt. # 192].  The State Defendants first contend that White is unqualified to offer expert testimony because he is not an academic and has never held a tenure-track position at a university.  Professorship is not a required credential for qualification as an expert to provide historical testimony under Rule 702.  Moreover, White has previously been qualified as an expert in cases addressing the interpretation of treaties between the United States and Indian tribes.  *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999).  If White's professional credentials are relevant, they may be appropriately discussed on cross examination.

The State Defendants next contend that both the Saginaw Chippewa's experts employ unreliable methodologies in reaching their conclusions concerning the historical understanding of the treaties.  First, the State Defendants contend that Anderson's report and proposed testimony is unreliable because it does not properly consider the historical context surrounding the treaty negotiations, or employ the proper methodology in considering the historical context.  State Defs. Mot. at 13–15.  The history of the Saginaw, Swan Creek, and Black River Bands' interactions with

-29-

the United States is important to understanding the motivations and intentions underlying the 1855 and 1864 treaties. Although Anderson devotes substantially less attention to pre-1850 history than Gulig, he certainly acknowledges that the 1855 Treaty was not the first between the parties, and that federal policy changes regarding removal, at least in part, motivated the new treaty. Anderson Rep. at 1–6. Different experts will focus on different facts; that does not provide cause for exclusion of the expert whose focus a party dislikes. Moreover, the factual "context" underlying the treaties involves more than just the history of relations between the Saginaw Chippewa and the United States, and should also include social and political facts about the area of central Michigan where Isabella County is located from the relevant time period. Anderson provides a substantial amount of information about social and political context, and Gulig provides substantial historical context. There is value in considering both perspectives.

Next, the State Defendants contend White made "four fundamental methodological errors" in his report:

> [1] he uses a treaty journal from separate treaty negotiations with other Indians to interpret the meaning of the 1855 Saginaw Treaty and the 1864 Treaty with the Saginaw Chippewa Indian Tribe; [2] he uses irrelevant maps from secondary sources in arriving at his historical opinion; [3] he considers only maps that support his interpretation; and [4] he considers evidence of events after 1904 in determining the intent of the parties to the 1855 Saginaw Treaty and the 1864 Treaty.

State Defs. Mot. at 11, 15–19.

As to the first contention, the treaty journal from the 1855 Ottawa Chippewa Treaty may be relevant, even though it documents a separate negotiation, because it is a contemporaneous account of a negotiation between federal negotiators and a similarly situated Indian tribe. The negotiation of the Ottawa Chippewa Treaty immediately proceeded the negotiation of the 1855 Saginaw Chippewa Treaty, and was conducted by the same federal negotiators. Some historical evidence

even suggests that members of the Saginaw, Swan Creek, and Black River Bands attended the Ottawa Chippewa negotiations.  Moreover, some of the terms of the treaties are quite similar and may have been the product of similar motivations and intentions.  Similarly, the ways in which those provisions differ may also be the result of different motivations and intentions.  A treaty journal detailing negotiation of the 1855 Saginaw Chippewa Treaty would be more helpful, but in its absence, there is no reason to exclude White's report because it looks instead to the Ottawa Chippewa treaty journal from the same period of time.

The State Defendants next object to White's use of historical maps to support his report, contending he used only those maps which supported his conclusions and ignored unfavorable maps.  To the extent this is actually true—the State Defendants have not provided the Court with a single example of a relevant map that was ignored by White's report—it is an insufficient reason for excluding White's testimony.  The maps cited by White outline the six Isabella County townships enumerated in the treaties; they are some evidence of the historical understanding of the treaties.  The proper weight to be given to the maps, and the conclusions White draws from the maps, will likely be addressed on cross examination.

The State Defendants' final objection to White's report is that he considers evidence of events after 1904 in reaching his conclusions concerning the intent of the parties to the 1855 and 1864 treaties.  The Saginaw Chippewa agree that events occurring after 1904 are irrelevant to the interpretation of the treaties.  However, assigning a specific cutoff date as to the relevant time period is not appropriate.  To the extent White's report relies on events that occurred after 1904, his conclusions concerning those events will be afforded substantially less weight than his conclusions concerning events that occurred in 1864.  His report will not, however, be excluded from evidence.

**D**

The State Defendants also filed a single motion, objecting to both the United States' experts. [Dkt. # 198].  The State Defendants first object to Hoxie's use of the treaty journal from the 1855 Ottawa-Chippewa Treaty to inform his understanding of the 1855 Saginaw Chippewa Treaty.  As previously discussed, use of the Ottawa-Chippewa treaty journal is not grounds for exclusion of the report.  The Court recognizes that the relevant provisions of the two treaties are different, and that the Ottawa-Chippewa treaty journal is not by any means "conclusive" proof of the meaning of the Saginaw Chippewa Treaty.  That recognition, however, affects the weight to be afforded to Hoxie's conclusions concerning the 1855 Treaty and the Ottawa-Chippewa journal, not the admissibility of his report.

The State Defendants also object to Edmunds' use of events that occurred after 1904 to inform his interpretation of the treaties.  Again, as discussed previously, this will effect the weight afforded Edmunds' testimony, not its admission.

The State Defendants' final objection to the United States' experts contends that Edmunds' used a report compiled by a historian not involved in the case, and presented that historian's conclusions as his own.  According to the State Defendants, "Dr. Edmunds . . . adopt[ed] the interpretation of anthropologist Dr. Charles Cleland in concluding that Article 6 of the 1855 Saginaw Chippewa Treaty did not dissolve the tribal relations of the Saginaw Chippewa.  He did little research, consisting of looking at a general book on Great Lakes Indians and the 1855 Saginaw Treaty, to confirm Dr. Cleland's findings."  State Defs. Mot. at 13.

The United States responds that Edmunds used the Cleland report primarily to provide

background information, and in any event, it is the type of reliable secondary source that is appropriately used by historians.  The United States also contends that Edmunds' primary goal was not to interpret the treaties, but to "ascertain whether various entities, such as the federal government and the tribal people, envisioned and treated the land described in the 1855 and 1864 Treaties as an Indian reservation."  U.S. Resp. at 9.

Portions of Edmunds' report do indeed focus on information that is irrelevant, at least to the initial phase of litigation.  For example, the information he provides about the Saginaw Chippewa's philanthropic pursuits and their casino and resort operations in the Mt. Pleasant area will not be helpful to the determination of whether the six townships are Indian Country.  Edmunds Rep. at 54–62.  The law is clear that modern "action or inaction of third parties" cannot "disestablish or diminish reservations."  U.S. Reply Br. at 6; [Dkt. # 98].  Moreover, his initial analysis of the formation of the "reservation" and the treaties themselves is not as well developed as that of some of the other experts.  *Id.* at 2–11.

Still, to the extent Edmunds' report outlines the historical understanding of the treaties, particularly from the perspective of the Saginaw Chippewa signatories in the immediate aftermath of the 1864 negotiations, it should not be excluded.  Although the sections of the report that focus on the period after 1890 may not be of much use, the Court is capable of sorting through the extraneous material to find the useful and reliable information that Edmunds provides.  *See* State Defs. Reply at 5.  The fact that his focus was on historical understanding of the townships in question and not on the treaties themselves does not justify exclusion of his report and proposed testimony.

**IV**

One measure of the value of an expert's opinion is whether an objective and disinterested methodology was employed. Objectivity can be measured by the expert's inclusion and discussion of counter-arguments and contrary sources of information. It can also be measured by exploration of potential biases the expert may hold. The most significant issue with the retained experts in this case is that each expert's association with a particular side of the argument creates an inherent bias that is difficult to overcome. The process of extracting conclusions from particular facts begins to look less like the objective analysis of a scholar and more like the persuasive argument of an advocate.

Legal scholars have suggested a variety of solutions to the problems associated with evaluating historical testimony, including the use of neutral, court-appointed experts; requiring the judge, or a special master, to evaluate the primary source data personally; and eliminating the "reliability" prong of the *Daubert* test. *See* Maxine D. Goodman, *Slipping Through the Gate: Trusting* Daubert *and Trial Procedures to Reveal the 'Pseudo-Historian' Expert Witness and to Enable the Reliable Historian Expert Witness—Troubling Lessons from Holocaust-Related Trials*, 60 Baylor L. Rev. 824, 861–73 (2008). Perhaps some of those solutions would provide for more nuanced and reliable historical testimony. In this case, however, a neutral expert was not requested or appointed, the demands of the Court's docket make independent primary-source research impracticable, and development of a new test for admissibility of historical testimony seems unnecessary. More importantly, the expert opinions provided, while perhaps flawed in some respects, are reasonably reliable and will be helpful in determining the ultimate issue in this case. Consequently, they are admissible under Rule 702, and will be considered and weighed

-34-

appropriately.

Accordingly, it is **ORDERED** that the United States' motion to strike the report and testimony of Anthony G. Gulig [Dkt. # 188] is **DENIED**.

It is further **ORDERED** that the United States' motion to strike the report and testimony of Theodore J. Karamanski [Dkt. # 189] is **DENIED**.

It is further **ORDERED** that the Saginaw Chippewa's motion to strike the testimony of the State Defendants' experts [Dkt. # 190] is **DENIED**.

It is further **ORDERED** that the State Defendants' motion to strike the testimony of the Saginaw Chippewa's experts [Dkt. # 192] is **DENIED**.

It is further **ORDERED** that the County of Isabella's motion to strike the testimony of the Saginaw Chippewa's experts [Dkt. # 197] is **DENIED**.

It is further **ORDERED** that the State Defendants' motion to strike the testimony of the United States' experts [Dkt. # 198] is **DENIED**.

It is further **ORDERED** that, to the extent it is still pending, the City of Mt. Pleasant's motion in limine to preclude the testimony of the Saginaw Chippewa's experts and the United States' experts [Dkt. # 199] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
The United States District Judge

Dated: February 4, 2010

-35-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 4, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS